1  AMAMGBO & ASSOCIATES
   DONALD AMAMGBO, ESQ.
2  7901 Oakport Street, Suite 4900
   Oakland, CA 94621
3  Telephone: 510-615-6000
   Facsimile: 510-615-6025
4

5  REGINALD TERRELL
   THE TERRELL LAW GROUP
6  223 25th Street
   Richmond, CA 94804
7  Telephone: 510-237-9700
   Facsimile: 510-237-4616
8  Email: reggiet2@aol.com

9
   Attorneys for Plaintiff
10 Lisa Blackwell

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14

15 | LYNN BARTON, on behalf of herself and all        Case No.: C08-1341 JSW
   | others similarly situated
16 |
   | Plaintiffs,
17 | __                                               **DECLARATION OF REGINALD
   | v.                                               TERRELL IN SUPPORT OF MOTION
18 |                                                  TO CONSIDER WHETHER CASES
   | FIDELITY NATIONAL FINANCIAL, INC.,               SHOULD BE RELATED**
19 | et al.,
20 | Defendants.
21 | **This document relates to:**
22 | Lisa Blackwell, on behalf of himself and all     Case No.: C08-cv-01928 MEJ
   | others similarly situated,
23 |
   | Plaintiff,
24 |
   |                        Plaintiff,
25 |
   |       v.
26 |
   | FIDELITY NATIONAL FINANCIAL, INC.,
27 | et al.,
28 |                       Defendants._____

                                       1
       **DECL. OF REGINALD TERRELL ISO MOTION TO CONSIDER WHETHER CASES SHOULD BE
                                    RELATED**

1

2

Defendants._____

3

4

I, REGINALD TERRELL, declare as follows:

5

1.      I am the principal of the Terrell Law Group and am a member in good standing of the State Bar of California.  This Declaration is based on personal knowledge, except where specified that information is based on information and belief, and if called to testify, I could and would do so competently as to matters set forth herein.  I am counsel for Plaintiff Lisa Blackwell in Blackwell v. Fidelity National Financial, Inc. et al., Case No. C08-01928 MEJ.  I submit this Declaration in support of Plaintiff Lisa Blackwell's administrative Motion to Consider Whether Cases Should Be Related.

6

7

8

9

10

11

2.      Attached as Exhibit A is a true and correct copy of the class action complaint filed on March 10, 2008 in Barton v. Fidelity National Financial, Inc., et al., Case No. C08-01341 JSW.

12

13

3.      Attached as Exhibit A is a true and correct copy of the class action complaint filed on April 11, 2008 Blackwell v. Fidelity National Financial, Inc. et al., Case No. C08-01928 MEJ.

14

15

4.      The defendants that have been named herein have not yet appeared in this action. Civil Local Rule 3-12 requires that an Administrative Motion to Consider Whether Cases Should Be Related be promptly filed.  Accordingly, and as the Defendants are in the process of being served, a stipulation could not be obtained prior to filing Plaintiff's Administrative Motion.

16

17

18

19

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 25ᵗʰ day of July, 2008 at Richmond, Contra Costa County, California.

20

21

22

23

24

_____
REGINALD TERRELL

25

26

27

28

**DECL. OF REGINALD TERRELL ISO MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**

# EXHIBIT A

1   Reed R. Kathrein (139304)
   Jeff D. Friedman (173886)
2   HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3   Berkeley, CA 94710
   Telephone: (510) 725-3000
4   Facsimile: (510) 725-3001
   reed@hbsslaw.com
5   jefff@hbsslaw.com

6

7   Attorneys for Plaintiff

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10   LYNN BARTON, on behalf of herself and all
    others similarly situated,

11                         Plaintiff,

12      v.

13   FIDELITY NATIONAL FINANCIAL, INC.,
   FIDELITY NATIONAL TITLE INSURANCE
14   COMPANY, TICOR TITLE INSURANCE
   COMPANY, TICOR TITLE INSURANCE
15   COMPANY OF FLORIDA, CHICAGO TITLE
   INSURANCE COMPANY, NATIONAL TITLE
16   INSURANCE OF NEW YORK, INC.,
   SECURITY UNION TITLE INSURANCE
17   COMPANY, THE FIRST AMERICAN
   CORPORATION, FIRST AMERICAN TITLE
18   INSURANCE COMPANY, UNITED
   GENERAL TITLE INSURANCE COMPANY,
19   LANDAMERICA FINANCIAL GROUP, INC.,
   COMMONWEALTH LAND TITLE
20   INSURANCE COMPANY, LAWYERS TITLE
   INSURANCE CORPORATION,
21   TRANSNATION TITLE INSURANCE
   COMPANY, STEWART TITLE GUARANTY
22   COMPANY and STEWART TITLE
   INSURANCE COMPANY
23
                        Defendants.
24

25

26

27

28

E-filing

CV 08 1341 EDL

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ...................................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................................ 3

III.   PARTIES .................................................................................................................. 4

       A.    Plaintiff ......................................................................................................... 4

       B.    Defendants .................................................................................................... 4

IV.    OTHER ENTITIES .................................................................................................. 8

V.     CLASS ACTION ALLEGATIONS ......................................................................... 9

VI.    TRADE AND COMMERCE .................................................................................. 11

VII.   FACTUAL ALLEGATIONS .................................................................................. 11

       A.    The Nature of Title Insurance .................................................................... 11

       B.    Price-Fixing in the Large Markets .............................................................. 13

       C.    TIRSA's Formation ..................................................................................... 14

       D.    Lack of Regulatory Supervision and Authority in New York and
             Other States Including California ................................................................ 15

       E.    Competition Based on Kickbacks and Inducements But Not Rates ............ 19

       F.    Other Indicators of a Lack of Competition and Conditions Conducive
             to Collusive Rate Setting ............................................................................ 19

VIII.  CLAIMS FOR RELIEF ......................................................................................... 22

       COUNT I  Violation of the Sherman Act ............................................................. 22

       COUNT II  Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.* .................. 23

       COUNT III  (California's Business & Professions Code §§ 17200, *et seq.*) ......... 23

       COUNT IV  Unjust Enrichment ........................................................................... 24

PRAYER FOR RELIEF ..................................................................................................... 25

JURY TRIAL DEMANDED .............................................................................................. 25

Plaintiff, Lynn Barton, by her attorneys, on behalf of herself and all others similarly situated, brings this action for treble damages and injunctive relief under the antitrust laws of the United States and based on statutes of the State of California against the above named defendants, demand a trial by jury, and complaining and alleging as follows:

## I.    INTRODUCTION

1.    From the consumer's point of view, title insurance differs greatly from other, more familiar kinds of insurance. For one thing, while automobile and homeowner insurance policies protect consumer from an event that may occur in the future, title insurance offers protection from events that might have occurred in the past.

2.    Most simply, title insurance is protection purchased against a loss arising from problems that occurred in the past and may affect the title to the real estate that a consumer is buying. Title insurers do not compete on the basis of the policies or coverage that they provide. In fact, almost all title policies are based on a single set of form policies published and maintained by the national trade association, the American Land Title Association. Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real value of the title policy which is written to cover only unknown defects in title at the time of issuance. As a result, title insurance is a commodity product.

3.    Even for the savviest of insurance consumers, the purchase of a title insurance policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of paperwork and signings that culminate in the closing of a home purchase. Consumers who normally shop around for their insurance and carefully compare prices, typically emerge from the closing on their new home holding an insurance policy that they know virtually nothing about and that in all likelihood, they will never need.

4.    The title insurance market in California consists of a dozen carriers, ranging in size from regional companies to national affiliates. However, the market is dominated by four groups of affiliated companies which, combined, sell over 90 percent of the title insurance policies sold in

-1-

1  California and which own and control the title plants in many California counties that every title

2  insurer must rely on in order issue title policies.

3       5.     Title companies, in marked contrast to property, casualty, life and other traditional

4  insurance carriers, choose not to market their products directly to the consumers who pay for them.

5  Instead, the title insurance industry operates on what is termed a "reverse competition" model.

6  Reverse competition means that title companies solicit business referrals from the other major

7  players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders,

8  developers and others:  middlemen or go-betweens.  The title companies pay middlemen for these

9  referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs

10  and inducements.  In addition, middlemen such as Windermere, John L. Scott and Caldwell

11  Banker-Bain, who themselves control a significant portion of the real estate brokerage market, take

12  significant ownership stakes in local title agents and affiliates of the major title insurers and

13  thereby get a direct return in profit from the referral of title business to the title agent whom they

14  partly or wholly own.

15       6.     Reverse competition, as the term suggests, isn't a model that benefits consumers

16  through market-driven forces.  In fact, consumers are bypassed completely as title companies

17  spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18  builders, developers and others in an effort to convince these middlemen to steer their home-

19  buying clients to their companies for their title insurance needs.

20       7.     In some of the major markets in the United States, these same title insurers

21  collectively meet, and jointly set rates and file these rates with the applicable state insurance

22  authority.  The rates are not subject to any meaningful review or regulation.  The companies agree

23  to fix the price of title insurance far in excess of the risk and loss experience associated with such

24  insurance.  As a result of the joint agreement as to rates, competition is relegated to the middleman.

25  As a result of their joint rate setting and agreement, no company competes on price to the

26  consumer.

27       8.     Having agreed to fix prices in states where joint rate setting occurs, the companies

28  agreed to not compete based on price to the consumer in other states, including California, where

CLASS ACTION COMPLAINT
010031-11 226460 V1

1  regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive

2  prices and to compete based on offering inducements to middlemen. In California, in three

3  successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing

4  number" of such inducements that are in violation of state law. However, the OIC does not

5  actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do

6  so. The absence of regulation has allowed collusive behavior and excessive rates.

7       9.    In addition to paying inducements and kick-backs, the title companies and their

8  agents divide the market of real-estate middlemen through the use of Affiliated Business

9  Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership

10  stakes in favored title insurance affiliates. The real estate brokers then reward their associates for

11  using the preferred title insurance providers and lock-out independent title insurers.

12       10.    In this action, plaintiff, on behalf of a Class of those purchasing title insurance in

13  California, seek damages arising from defendants' violations of the Sherman Act as well as

14  California statutory law.

15            **II.**      **JURISDICTION AND VENUE**

16       11.    This Complaint is filed and these proceedings are instituted under Sections 4 and 16

17  of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain

18  injunctive relief and to recover treble damages and the costs of suit, including a reasonable

19  attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the

20  Class which she represents by reason of defendants' and their co-conspirators' violations, as

21  hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

22       12.    Defendants transact business, maintain offices or are found within the Northern

23  District of California. The interstate commerce described hereinafter is carried on, in part, within

24  the Northern District of California and the conspiratorial acts herein alleged were carried on, in

25  part, in the Northern District of California.

26       13.    Intradistrict Assignment: Assignment to the San Francisco or Oakland division of

27  this Court is appropriate because a substantial part of the events or omissions which give rise to the

28

-3-

CLASS ACTION COMPLAINT
010031-11 226460 V1

1 claim occurred in the county of San Francisco.  Pursuant to Northern District of California, Local

2 Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is proper.

3          **III. PARTIES**

4 **A. Plaintiff**

5    14. Plaintiff, Lynn Barton, is an individual residing in San Francisco County,

6 California.  During the Class Period, plaintiff purchased title insurance directly from one or more

7 of the defendants herein and has been injured by reason of the antitrust violations alleged.

8 **B. Defendants**

9    15. Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

10 corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity National

11 does business in California through one or more of its subsidiaries, including but not limited to,

12 defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title

13 Insurance Company of Florida,  National Title Insurance of New York, Inc., Security Union Title

14 Insurance Company, and Chicago Title Insurance Company.  Fidelity National is registered to do

15 business in California.

16    16. Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

17 Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

18 FNTIC does business in California, is a licensed title insurance company in California and is

19 registered to do business in California.

20    17. Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

21 with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor does

22 business in California, is a licensed title insurance company in California and is registered to do

23 business in California.

24    18. Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

25 corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

26 TTICF does business in California, is a licensed title insurance company in California and is

27 registered to do business in California.

28

- 4 -

CLASS ACTION COMPLAINT
010031-11  226460 V1

19.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Chicago Title does business in California, is a licensed title insurance company in California and is registered to do business in California.

20.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. NTINY does business in California, is a licensed title insurance company in California and is registered to do business in California.

21.    Defendant Security Union Title Insurance Company ("SUTIC") is a California corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. SUTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

22.    The Fidelity family of title insurance companies (collectively, "Fidelity") – which includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California.  Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion.  Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below) and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

23.    The Fidelity family of title insurance companies and their affiliates are wholly-owned and controlled by defendant Fidelity National Financial, Inc.  Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services.  Fidelity National had 2006 revenues of roughly $9.4 billion.  The Fidelity family of title insurance companies engaged in the conduct challenged herein with the approval and assent of defendant Fidelity National.

CLASS ACTION COMPLAINT
010031-11  226460 V1

24.     Defendant The First American Corporation ("First American") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including but not limited to, defendants First American Title Insurance Company and United General Title Insurance Company.

25.     Defendant First American Title Insurance Company ("FATIC") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

26.     Defendant United General Title Insurance Company ("UGTIC") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

27.     The First American family of title insurance companies (collectively, "First American") – which includes defendants First American, FATIC and UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

28.     The First American family of title insurance companies and their affiliates are wholly-owned and controlled by defendant The First American Corporation. Through its subsidiaries, First American is a provider of title insurance, business information, and related products and services. First American had 2006 revenues of roughly $8.5 billion. The First

- 6 -

CLASS ACTION COMPLAINT
010031-11  226460 V1

1   American family of title insurance companies and their affiliates engaged in the conduct

2   challenged herein with the approval and assent of defendant First American.

3        29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

4   corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

5   business in California through one or more of its subsidiaries, including but not limited to,

6   defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

7   and Transnation Title Insurance Company.

8        30.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

9   Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen,

10  Virginia 23060. CLTIC does business in California, is a licensed title insurance company in

11  California and is registered to do business in California.

12       31.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation

13  with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does

14  business in California, is a licensed title insurance company in California and is registered to do

15  business in California.

16       32.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska

17  corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

18  TNTIC does business in California, is a licensed title insurance company in California and is

19  registered to do business in California.

20       33.    The LandAmerica family of title insurance companies (collectively,

21  "LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

22  affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

23  estate throughout the United States, including California. Nationally, LandAmerica accounts for

24  approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.

25  Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

26  inception have charged title insurance rates in New York that TIRSA collectively sets.

27       34.    The LandAmerica family of title insurance companies and their affiliates are

28  wholly-owed and controlled by defendant Land America Financial Group, Inc. Through its

- 7 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

Case 3:08-cv-01341-JSW     Document 32-2     Filed 07/27/2008     Page 11 of 29
Case 3:08-cv-01341-JSW     Document 25     Filed 07/16/2008     Page 14 of 59
Case 3:08-cv-01341-JSW     Document 1     Filed 03/10/2008     Page 12 of 30

1   subsidiaries, LandAmerica is a provider of title insurance and other products and services that

2   facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

3   LandAmerica had 2006 revenues of roughly $4 billion. The LandAmerica family of title insurance

4   companies and their affiliates engaged in the conduct challenged herein with the approval of

5   defendant LandAmerica.

6          35.     Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

7   headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. STGC does business in

8   California, is a licensed title insurance company in California and is registered to do business in

9   California.

10         36.     Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

11  with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017. STIC does

12  business in California, is a licensed title insurance company in California and is registered to do

13  business in California.

14         37.     The Stewart family of title insurance companies (collectively, "Stewart") – which

15  includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to

16  purchasers of commercial and residential real estate throughout the United States and California.

17  Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

18  amounted to roughly $2 billion. Stewart was a founding member of TIRSA and since TIRSA's

19  inception has charged title insurance rates in New York that TIRSA collectively sets.

20         38.     Together, defendants account for more than 85 percent of the title premiums

21  consumers pay in California. Nationally, they account for more than 85 percent of title premiums,

22  which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages period,

23  defendants charged California consumers in California virtually identical title insurance rates.

### IV.     OTHER ENTITIES

25         39.     TIRSA is a voluntary association of title insurers licensed as a rate service

26  organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains its

27  offices in New York City, which until recently were located at the same New York address of

28  Fidelity Title.

- 8 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

1    40.    TIRSA annually compiles from its members statistical data relating to their title

2    insurance premiums, losses and expenses and submits this information in aggregate form to the

3    New York Insurance Department.  TIRSA also prepares and submits the New York Title Insurance

4    Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's

5    members.  The Insurance Department has never objected to any of the rates TIRSA has collectively

6    set.  Similarly, the California OIC has not actually held a public hearing or conducted any other

7    review or regulation of the title insurance rates in California for thirty years.

8    41.    TIRSA's membership is comprised of defendant insurers and all other title insurers

9    that are licensed to issue policies in New York.  Currently, Fidelity, First American, LandAmerica,

10   and Stewart collectively represent 14 of TIRSA's 22 members.  As such, they comprise a majority

11   voting block which, according to TIRSA's by-laws, allows them to control the operations of

12   TIRSA and, in particular, TIRSA's collective rate setting activity.

13   42.    Various other persons, firms and corporations not made defendants herein have

14   participated as co-conspirators with the defendants in the violations alleged herein and have

15   performed acts and made statements in furtherance thereof.

16                   **V.    CLASS ACTION ALLEGATIONS**

17   43.    Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the

18   Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons

19   excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who

20   purchased directly, from one or more of the defendants and/or their co-conspirators title insurance

21   for residential and commercial property in California during the four year period preceding this

22   lawsuit and who have sustained damages as a result of the conspiracy herein alleged.  The number

23   of potential Class members is so numerous that joinder is impracticable.

24   44.    Plaintiff, as representative of the Class, will fairly and adequately protect the interest

25   of the Class members.  The interests of plaintiff are coincident with, and not antagonistic to, those

26   of the Class members.

27   45.    Except as to the amount of damages each member of the Class has by itself

28   sustained, all other questions of fact and law are common to the Class, including but not limited to,

- 9 -

CLASS ACTION COMPLAINT

010031-11 226460 V1

1    the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act

2    (15 U.S.C. § 1) and the effects of such violation.

3        46.    Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a

4    result of paying supracompetitive prices for title insurance in California. These supracompetitive

5    prices were achieved as a result of defendants' illegal price-fixing activities and market allocation

6    and division.

7        47.    Members of the Class include hundreds of thousands, if not millions, of consumers.

8    They are so numerous that their joinder would be impracticable.

9        48.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal

10   Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule

11   (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with

12   injury by the anticompetitive conduct detailed herein.

13       49.    Defendants have acted, continued to act, refused to act and continued to refuse to act

14   on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final

15   injunctive relief with respect to the Rule (b)(2) Class as a whole.

16       50.    Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of

17   consumers. They are so numerous that their joinder would be impracticable.

18       51.    Common questions of law and fact exist with respect to all Class members and

19   predominate over any questions solely affecting individual Class members. Among the questions

20   of law or fact common to the class are the following:

21        •    Whether defendants have engaged in the alleged illegal price-fixing activity
              and market allocation and division.

22

23        •    The duration and scope of defendants' alleged illegal price-fixing and market
              allocation and division activity.

24        •    Whether defendants' alleged illegal price-fixing and market allocation and
              division has caused higher prices to plaintiffs and other purchasers of title

25             insurance in California.

26        •    Whether the Insurance Commissioner has actively supervised defendants'
              price fixing and market allocation and division.

27

28

- 10 -

CLASS ACTION COMPLAINT

010031-11  226460 V1

52.     Plaintiff does not have any conflict of interest with other Class members.  Plaintiff's claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class.  Counsel competent and experienced in federal class action and federal antitrust litigation has been retained to represent the Class.

53.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible.  The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

54.     There will be no extraordinary difficulty in the management of the Class action.

## VI.     TRADE AND COMMERCE

55.     During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

56.     During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce.  In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

57.     During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

58.     During the period in suit, the defendants were the major sellers of title insurance in the United States and California.  Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

59.     The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.     FACTUAL ALLEGATIONS

### A.     The Nature of Title Insurance

60.     Title insurance is one of most costly items associated with the closing of a real estate transaction.  In California, rates for title insurance are based on a percentage of the total value of the property being insured.  For residential properties, this price ranged in 2005 from

- 11 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

1  about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property). For more

2  expensive homes and commercial properties, these prices are significantly higher. This amount

3  spent on title insurance has risen dramatically over the past decade.

4       61.    Title insurance serves an important purpose. It protects the purchaser of a property

5  from any unidentified defects in the title that would in any way interfere with the full and complete

6  ownership and use of the property with the ultimate right to resell the property. Title insurance is

7  required by lenders in most residential and commercial real estate transactions.

8       62.    Consumers exercise little discretion in choosing the title insurer from which they

9  purchase the insurance. That decision is typically made for them by their lawyer, mortgage broker,

10  lender, or realtor. Consequently, for most purchasers, the cost of title insurance is not challenged.

11  Most consumers do not even become aware of the price they will pay and to which insurer they

12  will pay it until the actual closing of the real estate transaction. By then it's too late, consumers

13  can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or

14  derailing the entire transaction. There is no shopping around. There is no negotiation of price.

15       63.    This dynamic basically removes the sale of title insurance from the normal

16  competitive process. Unlike the regular forces of supply and demand that keep most industries and

17  their pricing in check, the title insurance industry is not subject to any real competitive constraints.

18  The purchasers of the insurance, in most instances, are not the ones making the purchasing

19  decisions. And, they are certainly in no position to question the price.

20       64.    The most effective but illegal way for a particular title insurer to get business is to

21  encourage those making the purchasing decisions – the real-estate middlemen – to steer business to

22  that insurer. The best way to so motivate the middlemen is not through lower prices (that they are

23  not even paying). Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business

24  services and other financial enticements. Therefore, it is through higher pricing (which allows for

25  generous inducements and kick-backs), not lower pricing, that provides the best way for title

26  insurers to compete and increase their business.

27

28

1    **B.    Price-Fixing in the Large Markets**

2         65.    New York is one of several states in which the leading title insurers collectively fix

3    their prices through a rate-setting organization like TIRSA.  There are two principal cost

4    components that go into TIRSA's calculation.  One comprises the risk associated with issuing the

5    title policy.  The other comprises the "agency commissions" paid to title agents.

6         66.    The risk component covers the risk the title insurer bears for any undiscovered

7    defects in the title.  Unlike property insurance, title insurance carries with it a very limited risk of

8    loss to the insurer.  That is because title insurance protects against unknown *prior* events that cause

9    defects in title.  With a proper search and examination of prior ownership records, any such defects

10   can and almost always are readily identified and excluded from the policy's coverage.

11   Consequently, the average claim payout on a title insurance policy in the United States amounts to

12   only about 5 percent of the total premium collected.  This is very different from property coverage

13   (such as auto and home insurance) – which protects against *future* occurrences over which the

14   insurer has little to no control – where the average claim payout amounts to about 80 percent of the

15   total premium.

16        67.    The "agency commissions" component of the title insurance rate covers payments

17   made to title agents.  Defendants have an ownership or management stake in many of the title

18   agencies to which these payments are made.  A small portion of these payments is for the search

19   and exam of prior ownership records of the property being purchased to identify any liens,

20   encumbrances, burdens, exclusions, or other defects in the title.  The search and exam function

21   does not involve the spreading or underwriting of risk, and title insurers typically outsource this

22   task to title agents.

23        68.    The remainder, and by far the bulk, of the agency commissions are comprised of

24   costs unrelated to the issuance of title insurance.  These costs include kickbacks and other financial

25   inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers,

26   brokers, and lenders who, in reality, are the ones deciding which title insurer to use.  These

27   payments have nothing to do with the issuance of title insurance and are made by title insurers

28   merely to inflate their revenues and steer business their way.

- 13 -

CLASS ACTION COMPLAINT
010051-11  226460 V1

69.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the so-called "costs" associated with the payment of agency commissions. Only 15 percent is based on costs associated with the risk of loss.

70.    TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value – proportional to property value or otherwise – to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

71.    There are other states in which the defendants overly meet and agree to fix the rates for title insurance as part of a formal collective rate setting process.

C.    **TIRSA's Formation**

72.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade Commission("FTC") challenge to the collective rate setting activity of many of these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

73.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or analysis of their reasonableness or cost justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to "exercise[]sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

- 14 -

74.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval." *Id.* at 1139.

75.    Defendants formulated TIRSA's first rate manual and procedure soon after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*. They have done so by calculating a single rate that comprises both risk and agency commission costs and by outsourcing to title agents the agency commission costs. In this way, defendants avoid providing the Insurance Department with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed rates.

76.    TIRSA merely submits an aggregated figure that is supposed to represent the total agency commission costs. Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance. Defendants' design in all of this has been to effective "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

**D.    Lack of Regulatory Supervision and Authority in New York and Other States Including California**

77.    There is no provision under the New York Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance. Indeed, the New York Insurance Department has openly acknowledged that it lacks the authority to review any agency commission payments. It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public hearing the New York Insurance Department held – the first in 15 years – where it questioned

- 15 -

1   TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup

2   or detail for agency commissions.

3        78.    At the hearing, the Insurance Department conceded that it could not properly

4   evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost

5   information on agency commissions that TIRSA does not provide.

6        79.    The Insurance Department's recognition that it is not properly supervising TIRSA's

7   rate-setting activity is consistent with the April 2007 findings of the U.S. Government

8   Accountability Office ("GAO") that the title insurance industry is in need of greater state

9   regulation. The GAO studied the industry conditions of several states, including New York, and

10  concluded that "state regulators have not collected the type of data, *primarily on title agents' costs*

11  *and operations*, needed to analyze premium prices and underlying costs." (Emphasis added.)

12       80.    Unchecked by regulatory review and insulated from competition, defendants have

13  thus been able to collectively fix title insurance rates at supra competitive levels and earn profits

14  that vastly exceed those contemplated by the Insurance Department or that would have resulted in a

15  free and open competitive market.

16       81.    At the time of TIRSA's formation, the Insurance Department established 5 percent

17  (of the total premium) as the level of profit to which title insurers are entitled. The Insurance

18  Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its

19  revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a

20  reasonable premium. However, without the authority or ability to scrutinize agency commission

21  costs, the Insurance Department has been unable to perform this function. As a result, defendants

22  (through TIRSA) have been able to set artificially high title premiums and secure title profits far in

23  excess of the 5 percent threshold.

24       82.    Through an independent investigation conducted over the past several years, the

25  New York State Attorney General found that for every dollar of insurance premium defendants

26  collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid

27  out in claims. And, of the roughly 85 cents that supposedly covers agency commissions, only

28  between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.

- 16 -

Case 3:08-cv-01341-JSW    Document 32-2    Filed 07/27/2008    Page 20 of 29
Case 3:08-cv-01341-JSW    Document 25    Filed 07/16/2008    Page 23 of 59
Case 3:08-cv-01341-JSW    Document 1    Filed 03/10/2008    Page 21 of 30

1    These numbers show that title insurers' collectively fixed rates have resulted in profits that

2    untethered to and vastly exceed the costs of producing such policies.

3         83.    The New York Attorney General's investigation further revealed that what was

4    largely driving these numbers were the kickbacks and other financial inducements defendants were

5    funneling to and through title agents to secure more business. As reported at the New York

6    Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent

7    more than $1 million of these so-called "agency commissions" on items identified as "Christmas",

8    "automobile expenses", "political contributions", "promotional expenses", and "travel and

9    entertainment". These expenses are not even remotely related to the issuance of title insurance.

10        84.    The Washington State Insurance Commissioner's October 2006 report found

11    strikingly similarly abuses in Washington. Violations were pervasive and the Commissioner

12    concluded that consumers were paying too much as a result.

13        85.    All of this "excess money" paid to title agents not only works to steer business to

14    defendants. It also serves to boost defendants' own profits through the inflated revenues they

15    obtain to cover these agency payments and through their ownership or management stake in many

16    of these agencies.

17        86.    Defendants are competitors in the sale of title insurance to consumers throughout

18    the United States. These title insurers have agreed and engaged in concerted efforts to

19    (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in

20    their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,

21    and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed

22    "costs" from regulatory scrutiny by funneling them to and through title agents over which the

23    government agencies have no ability or authority to regulate.

24        87.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the

25    Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

26    competition and questions about the reasonableness of prices including:

27

28

CLASS ACTION COMPLAINT
010031-11  226460 V1

1      •    Consumers find it difficult to shop for title insurance,
2           therefore, they put little pressure on insurers and agents to
           compete based on price;

3      •    Title agents do not market to consumers, who pay for title
4           insurance, but to those in the position to refer consumers to
           particular title agents, thus creating potential conflicts of
5           interest;

6      •    A number of recent investigations by HUD and state
7           regulatory officials have identified instances of alleged illegal
           activities with the title industry that appear to reduce price
8           competition and could indicate excessive prices;

9      •    As property values or loan amounts increase, prices paid for
10          title insurance by consumers appear to increase faster than
           insurers' and agents' costs; and

11      •    In states where agents' search and examination services are
12          not included in the premium paid by consumers, it is not clear
           that additional amounts paid to title agents are fully supported
13           by underlying costs.

14      88.    The GAO visited several states, including California, and found a lack of regulatory

15 oversight:

16        In the states we visited, we found that regulators did not assess title
17        agents' costs to determine whether they were in line with premium
        rates; had made only limited efforts to oversee title agents (including
18        ABAs involving insurers and agents); and, until recently, had taken
        few actions against alleged violations of antikickback laws. In part,
19        this situation has resulted from a lack of resources and limited
        coordination among different regulators within states. On the federal
20        level, authority for alleged violations of section 8 of RESPA,
        including those involving increasingly complex ABAs, is limited to
21        seeking injunctive relief. Some state regulators expressed frustration
        with HUD's level of responsiveness to their requests for help with
22        enforcement, and some industry officials said that RESPA rules
        regarding ABAs and referral fees need to be clarified. Industry and
23        government stakeholders have proposed several regulatory changes,
24        including RESPA reform, strengthened regulation of agents, a
        competitor right of action with no monetary penalty, and alternative
25        title insurance models. [*Id.* at 41; footnotes omitted.]

26

27

28

CLASS ACTION COMPLAINT
010031-11 226460 V1

**E.     Competition Based on Kickbacks and Inducements But Not Rates**

89.     Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

90.     In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well. To compete on rates in other states could and would imperil their ability to maintain the agreed rate in states like New York.

91.     As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed. No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable. This is an environment which is conducive to price fixing.

92.     In California, there is a lack of regulatory authority and oversight over title insurance companies. The rates in California are not set as part of a deliberate state intervention and the state does not and cannot meaningfully renew or approve these rates. The rates at issue in this case went into effect without review.

**F.     Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

93.     In addition to the uniformity of rates, other facts suggest that it is more plausible than not that rates have been set based on an agreement to fix prices.

94.     In theory, the chain of title should be documented back to its historic grant of ownership centuries in the past. Fear about a possible title defect in the distant past is widely used as a justification by title agencies when convincing property buyers to purchase an owner policy in addition to the lender policy, which is mandatory to secure a mortgage. The title agency, however, saves much time and money when the search is limited to one or two transactions. They rely on the insurance policy to cover the remote chance of missing an earlier but still-valid claim. If such a claim is asserted and survives the scrutiny of the title insurance company's legal department, the expected cost of compensation is likely to be less than the sum of added overhead costs of routinely tracing back every chain of title to the earliest registered owner in the distant past.

- 19 -

95.    Title insurance industry officials tend to justify the large proportion of the premium retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the alleged high cost of title searching back into the distant past.  In fact, a high proportion of noncommercial properties are searched only through the most recent transaction.  No information is available as to what proportion of claims originate in the distant past.  The industry has never published pertinent statistics.  It would have a marketing incentive to publish these statistics if the risk were significant; that it has not published these statistics indicates that the risk probably is only slightly greater than zero.

96.    Many U.S. homes are being resold three or four times in twenty-five years.  At each of these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of the available title records, inheritance records, family records and records of past or current liens against a property.  It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

97.    Title searches have become less labor intensive, especially in large urban counties and cities.  More and more of the information is available online.  The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions are now insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years.  The evidence is strong that the title insurance industry has achieved a remarkably high level of loss minimization.

98.    Thus the costs of production have decreased as has the risk of loss yet none of these factors has resulted in price competition at the consumer level.

99.    There is a remarkable absence of rate changes by title insurers over the past five years, despite declining costs of production, increased number of transactions and increased revenue per transaction.  During a period when costs per unit of production declined significantly, underwritten title companies and title insurers maintained excessive rates.  The prices charged by title insurers and underwritten title companies were not and are not responsive to the changing costs of production or increasing revenue per transaction at a given set of rates.  Again, this is indicia of an agreement not to compete based on price.

- 20 -

100.    As noted, the title companies engage in illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals.  These illegal rebates and kickbacks – a consequence of reverse competition – show that title insurance rates are supra competitive and that some portion of the overcharge is passed from the underwritten title company or title insurer to the referrer of business.

101.    A lack of competition and the ability to control prices is enhanced by the fact that there were few title insurer entrants over the period from 1995 through 2005 and the number of title insurer groups declined as title insurers acquired other title insurers.  There were few underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled business arrangements whose addition to the market did not result in greater price competition.

102.    Access to title plants can be a barrier to entry, but a large barrier to entry exists due to the established relationships between the entities that can steer the consumer's title and escrow business and the entities who sell title insurance and escrow services.

103.    The title insurance market is highly concentrated – a few title insurers account for the vast majority of title insurance sales – at both the statewide level and at the county level in California.  For example, three title insurer groups account for 77.4% of the market at a statewide level.  At the county level, each individual market was highly concentrated.  The GAO found that First American and Fidelity had a market share of 66 percent.  Such a concentration enhances the ability of companies to fix prices

104.    The agreement not to compete based on price is also evidenced by the fact that no company has marketed its services to consumers, the ultimate purchasers of the product.  This is in marked contrast to real insurance, for example, car insurance, where the companies compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

- 21 -

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### Violation of the Sherman Act

105.   Plaintiff incorporates by reference the preceding allegations.

106.   Beginning at least as early as February 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

107.   The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

(a)   to fix, raise, maintain and stabilize the price of title insurance throughout California;

(b)   to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Californi; and

(c)   to allocate and divide the market for title insurance in California.

108.   In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

109.   Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

110.   Through their collective price-fixing, market allocation and division and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra competitive prices for title insurance in California, evidenced in part by the fact that the prices are uniformly higher than compared with the cost of providing the insurance.

- 22 -

CLASS ACTION COMPLAINT
010031-11 226460 V1

111.    The aforesaid combination and conspiracy has had the following effects among others:

(a)    price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b)    prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and

(c)    purchasers of title insurance have been deprived of the benefit of free and open competition.

112.    During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such that it would have paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has been injured and damaged in an amount presently undetermined.

## COUNT II

### Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq*.

113.    Plaintiff incorporates by reference the preceding allegations.

114.    Defendants conduct as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq*.).

115.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

## COUNT III

### (California's Business & Professions Code §§ 17200, *et seq*.)

116.    The preceding paragraphs of this Complaint are realleged and incorporated by reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§ 17200, *et seq*., on behalf of herself and the members of the Class.

117.    Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL.

- 23 -

CLASS ACTION COMPLAINT
010031-11  226460 V1

1    118.    All of the wrongful conduct alleged herein occurs and continues to occur in the

2    conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized

3    course of conduct that is repeated in the State of California on hundreds, if not thousands, of

4    occasions daily.

5    119.    Plaintiff has suffered injury in fact and has lost money or property as a result of

6    defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance

7    then she would or should have absent the conduct complained of.

8    120.    Plaintiff requests that this Court enter such orders or judgment as may be necessary

9    to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore

10    to any person in interest any money which may have been acquired by means of such unfair

11    competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful

12    and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code

13    § 3345, and for such other relief as set forth in the Prayer for Relief.

14    <center>COUNT IV</center>

15    <center>UNJUST ENRICHMENT</center>

16    121.    Plaintiff incorporates by reference the preceding allegations.

17    122.    This Cause of Action is pled in the alternative to all claims and/or causes of action

18    at law.

19    123.    Defendant has received a benefit from plaintiff and the Class members in the form

20    of the prices plaintiff and the Class members paid for defendants' title insurance.

21    124.    Defendants are aware of their receipt of the above-described benefit.

22    125.    Defendants received the above-described benefit to the detriment of plaintiff and

23    each of the other members of the Class.

24    126.    Defendants continue to retain the above-described benefit to the detriment of

25    plaintiff and the Class members.

26    127.    As a result of defendants' unjust enrichment, plaintiff and the Class members have

27    sustained damages in an amount to be determined at trial and seek full disgorgement and restitution

28

- 24 -

1    of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or

2    wrongful conduct alleged above.

### PRAYER FOR RELIEF

4    WHEREFORE, plaintiff demands:

5    A.    That the alleged combination and conspiracy among the defendants and their

6    co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

7    Section 1 of the Sherman Act;

8    B.    That the Court declare that the premiums charged are excessive under state law and

9    order damages;

10    C.    That judgment be entered against defendants, jointly and severally, and in favor of

11    plaintiff, and each member of the Class it represents, for threefold the damages determined to have

12    been sustained by plaintiff, and each member of the Class it represents, together with the cost of

13    suit, including a reasonable attorneys' fee;

14    D.    Each of the defendants, successors, assignees, subsidiaries and transferees, and their

15    respective officers, directors, agents and employees, and all other persons acting or claiming to act

16    on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any

17    manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination,

18    conspiracy, agreement, understanding or concert of action, adopting or following any practice,

19    plan, program, or design having a similar purpose or effect in restraining competition; and

20    E.    Such other and further relief as may appear necessary and appropriate.

### JURY TRIAL DEMANDED

22    Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

23    DATED: March 10, 2008.

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
    JEFF D. FRIEDMAN (173886)

- 25 -

CLASS ACTION COMPLAINT
010031-11  226460 V1

Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
reed@hbsslaw.com

Steve W. Berman
Anthony D. Shapiro
Thomas E. Loeser (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, California 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
tony@hbsslaw.com
toml@hbsslaw.com

Attorneys for Plaintiff

CLASS ACTION COMPLAINT
010001-11 226460 V1

- 26 -

# EXHIBIT B



1   **DONALD AMAMGBO**
    **123 OAKPORT, SUITE 4900**
2   **OAKLAND, CA 94621**
    **TELEPHONE: 510 615 6000**
3   **FACSIMILE: : 10 615 6025**

4
    **REGINALD TERRELL**
5   **THE TERRELL LAW GROUP**
    **223 25TH STREET**
6   **RICHMOND 94804**
    **TELEPHONE: 510 237 9700**
7   **FACSIMILE: 510 237 4616**

8
    **Attorneys for Plaintiff**
9

E-filing

ORIGINAL
FILED
APR 11 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

MEJ

10                     UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12   LISA BLACKWELL, on Behalf of herself        No. **C08-01928**
     and All Others Similarly Situated,
13                                                CIVIL - CLASS ACTION
                   Plaintiff,
14                                                JURY TRIAL DEMANDED
            vs.
15
     FIDELITY NATIONAL FINANCIAL,
16   INC., FIDELITY NATIONAL TITLE
     INSURANCE COMPANY, TICOR TITLE
17   INSURANCE COMPANY, TICOR TITLE
     INSURANCE COMPANY OF FLORIDA,
18   CHICAGO TITLE INSURANCE
     COMPANY, NATIONAL TITLE
19   INSURANCE OF NEW YORK, INC.,
     SECURITY UNION TITLE INSURANCE
20   COMPANY, THE FIRST AMERICAN
     CORPORATION, FIRST AMERICAN
21   TITLE INSURANCE COMPANY,
     UNITED GENERAL TITLE INSURANCE
22   COMPANY, LANDAMERICA
     FINANCIAL GROUP, INC.,
23   COMMONWEALTH LAND TITLE
     INSURANCE COMPANY, LAWYERS
24   TITLE INSURANCE CORPORATION,
     TRANSNATION TITLE INSURANCE
25   COMPANY, STEWART TITLE
     GUARANTY COMPANY and STEWART
26   TITLE INSURANCE COMPANY

27

28

                                                                    -1-

                           COMPLAINT

Defendants

Plaintiff Lisa Blackwell, by her attorneys, on behalf of herself and all others similarly situated brings this action for treble damages and injunctive relief under the antitrust laws of the United States and based on statutes of the State of California against the above-named defendants, demand a trial by jury, and complaining and alleging as follows:

## I.    INTRODUCTION

1.    From the consumer's point of view, title insurance differs greatly from other, more familiar kinds of insurance. For one thing, while automobile and homeowner insurance policies protect consumers from an event that may occur in the future, title insurance offers protection from events that might have occurred in the past.

2.    Most simply, title insurance is protection purchased against a loss arising from problems that occurred in the past and may affect the title to the real estate that a consumer is buying. Title insurers do not compete on the basis of the policies or coverage that they provide. In fact, almost all title policies are based on a single set of form policies published and maintained by the national trade association, the American Land Title Association. Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real value of the title policy which is written to cover only unknown defects in title at the time of issuance. As a result, title insurance is a commodity product.

3.    Even for the savviest of insurance consumers, the purchase of a title insurance policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of paperwork and signings that culminate in the closing of a home purchase. Consumers, who normally show around for their insurance and carefully compare prices, typically emerge from the closing on their new home holding an insurance policy that they know virtually nothing about and that in all likelihood, they will never need.

4.    The title insurance market in California consists of a dozen carriers, ranging in size from regional companies to national affiliates. However, the market is dominated by four groups of affiliated companies which, combined, sell over 90 percent of the title insurance

-2-

1  policies sold in California and which own and control the title plants in many California counties

2  that every title insurer must rely on in order to issue title policies.

3       5.    Title companies, in marked contrast to property, casualty, life and other traditional

4  insurance carriers, choose not to market their products directly to the consumers who pay for

5  them. Instead, the title insurance industry operates on what is termed a "reverse competition"

6  model. Reverse competition means that title companies solicit business referrals from the other

7  major players in the home purchase scenario - real estate agents and agencies, banks, lenders,

8  builders, developers an others: middlemen or go-betweens. The title companies pay middlemen

9  for these referrals in the form of direct payments, advertising expenses, junkets, parties and other

10  kick-backs and inducements. In addition, middlemen such as Windermere, John L. Scott and

11  Caldwell Bank-Bain, who themselves control a significant portion of the real estate brokerage

12  market, take significant ownership stakes in local title agents and affiliates of the major title

13  insurers and thereby get a direct return in profit from the referral of title business to the title agent

14  whom the partly or wholly own.

15       6.    Reverse competition, as the term suggests, isn't a model that benefits consumers

16  through market-driven forces. In fact, consumers are bypassed completely as title companies

17  spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18  builders, developers and others in an effort to convince these middlemen to steer their home-

19  buying clients to their companies for their title insurance needs.

20       7.    In some of the major markets in the United States, these same title insurers

21  collectively meet, and jointly set rates and file these rates with the applicable state insurance

22  authority. The rates are not subject to any meaningful review of regulation. The companies

23  agree to fix the price of title insurance far in excess of the risk and loss experience associated

24  with such insurance. As a result of the joint agreement as to rates, competition is relegated to the

25  middleman. As a result of their joint rate setting and agreement, no company competes on price

26  to the consumer.

27       8.    Having agreed to fix prices in states where joint rate setting occurs, the companies

28  agreed to not compete based on price to the consumer in other states, including California, where

-3-

COMPLAINT

1   regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive

2   prices and to compete based on offering inducements to middlemen. In California, in three

3   successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing

4   number" of such inducements that are in violation of state law. However, the OIC does not

5   actively oversee or regulate rates, and, in fact, does not buy its own admission have the power to

6   do so. The absence of regulation has allowed collusive behavior and excessive rates.

7        9.      In addition to paying inducements and kick-backs, the title companies and their

8   agents divide the market of real-estate middlemen through the use of Affiliated Business

9   Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant

10  ownership in favored title insurance affiliates. The real estate brokers then reward their

11  associates for using the preferred title insurance providers and lock-out independent title insurers.

12       10.     In this action, plaintiff, on behalf of a class of those purchasing title insurance in

13  California seek damages arising from defendants' violations of the Sherman Act as well as

14  California statutory law.

15

16  **II.      JURISDICTION AND VENUE**

17       11.     This Complaint is filed and these proceedings are instituted under Section 4 and

18  16 of the Act of Congress of October 15, 1914 C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to

19  obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable

20  attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the

21  Class which she represents by reason of defendants' and their co-conspirators' violations, as

22  hereinafter alleged, of Section 1 of the Sherman Act (15 U.S.C. § 1).

23       12.     Defendants transact business, maintain offices or are found within the Northern

24  District of California. The interstate commerce described hereinafter is carried on, in part, within

25  the Northern District of California and the conspiratorial acts herein alleged were carried on, in

26  part, in the Northern District of California.

27       13.     Intra-district Assignment: Assignment to the San Francisco or Oakland division

28  of this court is appropriate because a substantial part of the events or omission which give rise to

-4-

COMPLAINT

1    the claim occurred in the county of San Francisco.  Pursuant to Northern District of California,

2    Local Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is

3    proper.

### III.    PARTIES

5        14.    Plaintiff Lisa Blackwell, is an individual residing in San Francisco County,

6    California.  During the class period, plaintiff purchased title insurance directly from one or more

7    of the defendants herein and has been injured by reason of the antitrust violations alleged.

8        15.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

9    corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity

10    National does business in California through one or more of its subsidiaries, including but not

11    limited to defendants Fidelity National Title Insurance Company, Ticor Title Insurance

12    Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York,

13    Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company.  Fidelity

14    National is registered to do business in California.

15        16.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

16    Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

17    32204.  FNTIC does business in California, is a licensed title insurance company in California

18    and is registered to do business in California.

19        17.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

20    with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor

21    does business in California, is a licensed title insurance company in California and is registered to

22    do business in California.

23        18.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

24    corporation with its principle place of business 601 Riverside Ave., Jacksonville, Florida 32204.

25    TTICF does business in California, is a licensed title insurance company in California and is

26    registered to do business in California.

27        19.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri

28    Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

-5-

COMPLAINT

1  32204.  Chicago Title does business in California, is a licensed title insurance company in

2  California and is registered to do business in California.

3       20.    Defendant National Title Insurance of New York, Inc. ("NYINY") is a New York

4  Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

5  32204.  NYINY does business in California, is a licensed title insurance company in California

6  and is registered to do business in California.

7       21.    Defendant Security Union Title Insurance Company Chicago Title Insurance

8  Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601

9  Riverside Ave., Jacksonville, Florida 32204.  Chicago Title does business in California, is a

10  licensed title insurance company in California and is registered to do business in California.

11       22.    The Fidelity family of title insurance companies (collectively, "Fidelity") - which

12  includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NYINY and SUTIC,

13  and their affiliates - in engaged in selling title insurance to purchases of commercial and

14  residential real estate throughout the United States, including California.  Nationally, Fidelity

15  accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly

16  $4.6 billion.  Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined

17  below) and since TIRSA's inception have charged title insurance rates in New York that TIRSA

18  collectively sets.

19       23.    The Fidelity family of title insurance companies and their affiliates are wholly-

20  owned and controlled by defendant Fidelity National Financial, Inc.  Through its subsidiaries,

21  Fidelity National is a provider of title insurance, specialty insurance, and claims management

22  services.  Fidelity National had 2006 revenues of roughly $9.4 billion.  The Fidelity family of

23  title insurance companies engaged in the conduct challenged herein with the approval and assent

24  of defendant Fidelity National.

25       24.    Defendant The First American Corporation ("First American") is a California

26  corporation with its headquarters at 1st American Way, Santa Ana, California 92707.  First

27  American does business in California through one or more its subsidiaries, including but not

28  limited to, defendant First American Title Insurance Company and United General Title

-6-

COMPLAINT

1 | Insurance Company.

2      25.    Defendant First American Title Insurance Company ("FATIC") is a California

3 | corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC

4 | does business in California is a licensed title insurance company in California and is registered to

5 | do business in California.

6      26.    Defendant United General Title Insurance Company ("UGTIC") is a Colorado

7 | corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC does

8 | business in California, is a licensed title insurance company in California and is registered to do

9 | business in California.

10      27.    The First American family of title insurance companies (collectively, "First

11 | American") - which includes defendants First American, FATIC and UGTIC, and their affiliates

12 | - is engaged in selling title insurance to purchasers of commercial and residential real estate

13 | throughout the United States, including California. Nationally, First American accounts for

14 | approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion.

15 | First American Title was a founding member if TIRSA and since TIRSA's inception has charged

16 | title insurance rates in New York that TIRSA collectively sets.

17      28.    The First American family of title insurance companies and their affiliates are

18 | wholly-owned and controlled by defendant The First American Corporation. Through its

19 | subsidiaries, First American is a provider of title insurance, business information, and related

20 | products and services. First American had 2006 revenues of roughly $8.5 billion. The First

21 | American family of title insurance companies and their affiliates engaged in the conduct

22 | challenged herein with the approval and assent of defendant First American.

23      29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

24 | corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

25 | business in California through one or more of its subsidiaries, including but not limited to,

26 | defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

27 | and Trans-nation Title Insurance Company.

28      30.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

-7-

1  Pennsylvania corporation with its principle place of business at 5600 Cox Road, Glen Allen,

2  Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in

3  California and registered to do business in California.

4        31.     Defendants Lawyers Title Insurance Corporation ("LTIC") is a Nebraska

5  corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

6  LTIC does business in California, is a licensed title insurance company in California and is

7  registered to do business in California.

8        32.     Defendants Trans-nation Title Insurance Corporation ("TNTIC") is a Nebraska

9  corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

10  TNTIC does business in California, is a licensed title insurance company in California and is

11  registered to do business in California.

12        33.     The LandAmerica family of title insurance companies (collectively,

13  "LandAmerica") - which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

14  affiliates - is engaged in selling title insurance to purchasers of commercial and residential real

15  estate throughout the United States, including California.  Nationally, LandAmerica accounts for

16  approximately 19 percent of title premiums, which in 2006 amount to roughly $3.15 billion.

17  Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

18  inception have charged title insurance rates in New York that TIRSA collectively sets.

19        34.     The LandAmerica family of title insurance companies and their affiliates are

20  wholly-owned and controlled by defendant Land America Financial Group, Inc.  Through its

21  subsidiaries, LandAmerica is a provider of title insurance and other products and services that

22  facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

23  LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title

24  insurance companies and their affiliates engaged in the conduct challenged herein with the

25  approval of defendant LandAmerica.

26        35.     Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

27  headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  STGC does business in

28  California, is a licensed title insurance company in California and is registered to do business in

-8-

1   California.

2       36.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

3   with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017.  STIC

4   does business in California, is a licensed title insurance company in California and is registered to

5   do business in California.

6       37.    The Stewart family of title insurance companies (collectively, "Steward") - which

7   includes defendants STGC and STIC, and its affiliates - is engaged in selling title insurance to

8   purchasers of commercial and residential real estate throughout the United States and California.

9   Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

10  amounted to roughly $2 billion.  Stewart was a founding member of TIRSA and since TIRSA's

11  inception has charged title insurance rates in New York that TIRSA collectively sets.

12      38.    Together, defendants account for more than 85 percent of title premiums

13  consumers pay in California.  Nationally, they account for more than 85 percent of title

14  premiums, which in 2006 amounted to roughly $14.5 billion.  Throughout the relevant damages

15  period, defendants charged California consumers in California virtually identical title insurance

16  rates.

17                    **IV.    OTHER ENTITIES**

18      39.    TIRSA is a voluntary association of title insurers licensed as a rate service

19  organization pursuant to Article 23 of the State of New York Insurance Law.  TIRSA maintains

20  its offices in New York City, which until recently were located at the same New York address of

21  Fidelity Title.

22      40.    TIRSA annually compiles from its members statistical data relating to their title

23  insurance premiums, losses and expenses and submits this information in aggregate form to the

24  New York Insurance Department.  TIRSA also prepares and submits the New York Title

25  Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by

26  TIRSA's members.  The Insurance Department has never objected to any of the rates TIRSA has

27  collectively set.  Similarly, the California OIC has not actually held a public hearing or conducted

28  any other review or regulation of the title insurance rates in California for thirty years.

-9-

COMPLAINT

1    41.    TIRSA's membership is comprised of defendant insurers and all other title

2    insurers that are licensed to issue policies in New York. Currently, Fidelity, First American,

3    LandAmerica and Stewart collectively represent 14 of TIRSA's 22 members. As such, they

4    comprise a majority voting block which, according to TIRSA's by-laws, allows them to control

5    the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

6    42.    Various other persons, firms and corporations not made defendants herein have

7    participated as co-conspirators with the defendants in the violations alleged herein and have

8    performed acts and made statements in furtherance thereof.

9    **V.    CLASS ACTION ALLEGATIONS**

10    43.    Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the

11    Federal Rules of Civil Procedure, on behalf of herself and a class consisting of all persons

12    excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who

13    purchased directly, from one or more of the defendants and/or their co-conspirators title

14    insurance for residential and commercial property in California during the four year period

15    preceding this lawsuit and who have sustained damages as a result of the conspiracy herein

16    alleged. The number of potential class members is so numerous that joinder is impracticable.

17    44.    Plaintiff, as representative of the class, will fairly and adequately protect the

18    interest of the class members. The interests of plaintiff are coincident with, and not antagonistic

19    to, those of the class members.

20    45.    Except as to the amount of damages each member of the class has by itself

21    sustained, all other questions of fact and law are common to the class, including but not limited

22    to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman

23    Act (15 U.S.C. §1) and the effects of such violation.

24    46.    Plaintiff, along with all other members of the Rule (b) (3) class, were injured as a

25    result of paying supra-competitive prices for title insurance in California. The supra-competitive

26    prices were achieved as a result of defendants' illegal price-fixing activities and market allocation

27    and division.

28    47.    Members of the class include hundreds of thousands, if not millions, of

-10-

COMPLAINT

1  consumers. They are so numerous that their joinder would be impracticable.

2      48.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal

3  Rules of Civil Procedure, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule

4  (b) (2) class includes all members of the (b) (3) class, and all consumers who are threatened with

5  injury by the anticompetitive conduct detailed herein.

6      49.    Defendants have acted, continued to act, refused to act and continued to refuse to

7  act on grounds generally applicable to Rule (b) (2) class, thereby making appropriate final

8  injunctive relief with respect to the Rule (b) (2) class as a whole.

9      50.    Members of the Rule (b) (2) class include hundreds of thousands, if not millions,

10  of consumers. They are so numerous that their joinder would be impracticable.

11      51.    Common questions of law and fact exist with respect to all class members and

12  predominate over any questions solely affecting individual class members. Among the questions

13  of law of fact common to the class are the following:

14      • Whether defendants have engaged in the alleged illegal price-fixing activity and

15          market allocation and division.

16      • The duration and scope of defendants' alleged illegal price-fixing and market

17          allocation and division activity.

18      • Whether defendants' alleged illegal price-fixing and market allocation and

19          division has caused higher prices to plaintiffs and other purchasers of title

20          insurance in California.

21      • Whether the Insurance Commissioner has actively supervised defendants' price

22          fixing and market allocation and division.

23      52.    Plaintiff does not have any conflict of interest with other class members.

24  Plaintiff's claims are typical of the claims of the class and they will fairly and adequately reflect

25  the interests of the class. Counsel competent and experienced in federal class action and federal

26  antitrust litigation has been retained to represent the class.

27

28      53.    This action is superior to any other method for the fair and efficient adjudication

-11-

COMPLAINT

1  of this legal dispute since joinder of all members is not only impracticable, but impossible. The

2  damages suffered by certain members of the class are small in relation to the expense and burden

3  of individual litigation and therefore it is highly impractical for such class members to seek

4  redress for damages resulting from defendants' anticompetitive conduct.

5

6      54.    There will be no extraordinary difficulty in the management of the class action.

7

### VI.    TRADE AND COMMERCE

8      55.    During all or part of the period in suit, defendants and their co-conspirators were

9  sellers of title insurance in California.

10     56.    During the period in suit, the defendants sold substantial quantities of title

11 insurance in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in

12 the United States paid $17 billion for residential title insurance policies.

13     57.    During the period in suit, class members from locations outside California

14 purchased commercial or residential property and title insurance within California.

15     58.    During the period in suit, the defendants were the major sellers of title insurance

16 in the United States and California. Defendants controlled in excess of 85 percent of the market

17 for title insurance in the United States and California.

18     59.    The activities of the defendants and their co-conspirators, as described herein,

19 were within the flow of interstate commerce and substantially affected interstate commerce.

20

### VII.    FACTUAL ALLEGATIONS

21 **A.    The Nature of Title Insurance**

22     60.    Title insurance is one of most costly items associated with the closing of real

23 estate transaction. In California, rates for title insurance are based on a percentage of the total

24 value of the property being insurance. For residential properties, this price ranged in 2005 from

25 about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000.00 property). For more

26 expensive homes and commercial properties, these prices are significantly higher. This amount

27 spent on title insurance has risen dramatically over the past decade.

28

-12-

COMPLAINT

1    61.    Title insurance serves an important purpose.  It protects the purchaser of a

2   property from any unidentified defects in the title that would in any way interfere with the full

3   and complete ownership and use of the property with the ultimate right to resell the property.

4   Title insurance is required by lenders in most residential and commercial real estate transactions.

5    62.    Consumers exercise little discretion in choosing the title insurer from which they

6   purchase the insurance.  That decision is typically made for them by their lawyer, mortgage

7   broker, lender, or realtor.  Consequently, for most purchasers, the cost of title insurance is not

8   challenged.  Most consumers do not even become aware of the price they will pay and to which

9   insurer they will pay it until the actual closing of the real estate transaction.  By then its too late,

10   consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of

11   delaying or derailing the entire transaction.  There is no shopping around.  There is no negotiation

12   of price.

13    63.    This dynamic basically removes the sale of title insurance from the normal

14   competitive process.  Unlike the regular forces of supply and demand that keep most industries

15   and their pricing in check, the title insurance industry is not subject to any real competitive

16   constraints.  The purchasers of the insurance, in most instances, are not the ones making the

17   purchasing decisions.  And, they are certainly in no position to question the price.

18    64.    The most effective but illegal way for a particular title insurer to get business is to

19   encourage those making the purchasing decisions - the real-estate middlemen - to steer business

20   to that insurer.  The best way to so motivate the middlemen is not through lower prices (that they

21   are not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, meals,

22   business services and other financial enticements.  Therefore, it is through higher pricing (which

23   allows for generous inducements and kick-backs), not lower pricing, which provides the best way

24   for title insurers to compete and increase their business.

25   **B.    Price-Fixing in the Large Markets**

26    65.    New York is one of several states in which the leading title insurers collectively

27   fix their prices through a rate-setting organization like TIRSA.  There are two principal cost

28   components that go into TIRSA's calculation.  One comprises the risk associated with issuing the

-13-

COMPLAINT

1  title policy. The other comprises the "agency commissions" paid to title agents.

2    66.    The risk components cover the risk the title insurer bears for any undiscovered

3  defects in the title.   Unlike property insurance, title insurance carriers with it a very limited risk

4  of loss to the insurer.  That is because title insurance protects against unknown prior events that

5  cause defects in title.  With a proper search and examination of prior ownership records, any such

6  defects can and almost always are readily identified and excluded from the policy's coverage.

7  Consequently, the average claim on a title insurance policy in the United States amounts to only

8  about 5 percent of the total premium collected.  This is very different from property coverage

9  (such as auto and home insurance) - which protects against future occurrences over the insurer

10  has little or no control - where the average claim payout amounts to about 80 percent of the total

11  premium.

12    67.    The "agency commissions" component of the title insurance rate covers payments

13  made to title agents.  Defendants have an ownership or management stake in many of the title

14  agencies to which these payments are made.  A small portion of these payments is for the search

15  and exam of prior ownership records of the property being purchased to identify any liens,

16  encumbrances, burdens, exclusions, or other defects in the title.  The search and exam function

17  does not involve the spreading or underwriting of risk, and title insurers typically outsource this

18  task to title agents.

19    68.    The remainder, and by far the bulk, of the agency commission are comprised of

20  costs unrelated to the issuance of title insurance.  These costs include kickbacks and other

21  financial inducements title insurers provide to title agents and indirectly (through title agents) to

22  the lawyers, brokers, and lenders who, in realty, are the ones deciding which title insurer to use.

23  These payments have nothing to do with the issuance of title insurance and are made by title

24  insurers merely to inflate their revenues and steer business their way.

25    69.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total tile

26  insurance premium is based on the so-called "costs" associated with the payment of agency

27  commissions. Only 15 percent is based on costs associated with the risk of loss.

28    70.    TIRSA publishes its final calculated title rates in the New York Title Insurance

-14-

COMPLAINT

1   Rate Manual. These rates are tied to the value of the property being insured. This is so despite

2   the fact that the costs associated with agency commissions are entirely unrelated to the value of

3   the property. Indeed, agency kickbacks and enticements have little to do with producing a

4   particular title policy and provide no value - proportional to property value. The instead depend

5   on the age of the property, the complexity of the ownership history, and the accessibility of prior

6   ownership records.

7        71.    There are other states in which the defendants overly meet and agree to fix the

8   rates for title insurance as part of a formal collective rate setting process.

9        **C.    TIRSA's Formation**

10       72.    Prior to TIRSA, the New York Board of Underwriters ("NYBTU") served as the

11  title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting

12  bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade

13  Commission ("FTC") challenge to the collective rate setting activity of many of these

14  associations. The FTC's challenge culminated in *FTC v. Ticor Title Inc. Co.*, 504 U.S. 621

15  (1992), where the Supreme Court held that to avoid *per se* illegal price fixing, the rate setting

16  activity of these rating bureaus must be actively supervised by the state.

17       73.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

18  contended that the respective state insurance departments merely rubber-stamped this portion of

19  the collectively fixed rates without any independent review or analysis of their reasonableness or

20  costs justification. The Supreme Court agreed with the FTC that this kind of limited state

21  oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance

22  department has to "exercise sufficient independent judgment and control so that the details of the

23  rates or prices have been established as a product of deliberate state intervention, not simply by

24  agreement among private parties." *Ticor*, 504 U.S. at 634-35.

25       74.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand

26  in *Ticor Title Ins. Co. v. FTC*, 998 F.2D 1129 (3d Cir. 1992), upheld the FTC's finding that the

27  collective rate-setting of certain state rating bureaus was improper because it was not actively

28  supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed

-15-

COMPLAINT

1  us that a state's rubber stamp is not enough.  Active supervision requires the state regulatory

2  authorities' independent review and approval". *Id.* at 1139.

3       75.    Defendants formulated TIRSA's first rate manual and procedure soon after the

4  Supreme Court's *Ticor* decision.  Through TIRSA, defendants have set up a rate-setting scheme

5  to get around the rigors of state oversight required by *Ticor*.  They have done so by calculating a

6  single rate that comprises both risk and agency commission costs and by outsourcing to title

7  agents the agency commission costs.  In this way, defendants avoid providing the Insurance

8  Department with any detailed breakout or backup for the bulk of the costs that make up their

9  collectively fixed rates.

10       76.    TIRSA merely submits an aggregated figure that is supposed to represent the total

11  agency commission costs.  Embedded within this figure is the vast quantity of dollars that are

12  funneled to and through the title agencies as kickbacks, financial inducements and other costs

13  unrelated to the issuance of title insurance.  Defendants' design in all of this has been to effective

14  "hide" the costs basis for their artificially high and collectively fixed title insurance premiums

15  form the regulatory scrutiny that *Ticor* demands.

16      **D.**    **Lack of Regulatory Supervision and Authority in New York and Other States Including California**

17

18       77.    There is no provision under the New York Insurance Law for TIRSA to include in

19  its collectively fixed rates kickbacks and other agency commission payments unrelated to the

20  issuance of title insurance.   Indeed, the New York Insurance Department has openly

21  acknowledged that it lacks the authority to review any agency commission payments.  It has

22  likewise recognized that defendants' outsourcing of agency commission costs has prevented it

23  from performing a meaningful review of TIRSA's calculated rates.  This was made clear at a

24  November 2006 public hearing at New York Insurance Department held - the first in 15 years -

25  where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance

26  Department with any backup or detail for agency commissions.

27       78.    At the hearing, the Insurance Department conceded that is could not properly

28  evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed costs

-16-

COMPLAINT

1  information on agency commissions that TIRSA does not provide.

2      79.    The Insurance Department's recognition that it is not properly supervising

3  TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government

4  Accountability Office ("GAO") that the title insurance industry is in need of greater state

5  regulation. The GAO studied the industry conditions of several states, including New York, and

6  concluded that "state regulators have not collected the type of data, *primarily on title agents'*

7  *costs and operations*, needed to analyze premium prices and underlying costs." (Emphasis

8  added.)

9      80.    Unchecked by regulatory review and insulated from competition, defendants have

10  thus been unable to collectively fix title insurance rates at supra competitive levels and ear profits

11  that vastly exceed those contemplated by the Insurance Department or that would have resulted in

12  a free and open competitive market.

13      81.    At the time of TIRSA's formation, the Insurance Department established 5 percent

14  (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance

15  Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its

16  revenue and cost formation, to ensure that this 5 percent profit level is maintained and based on a

17  reasonable premium.  However, without the authority or ability to scrutinize agency commission

18  costs, the Insurance Department has been unable to perform this function.  As a result, defendants

19  (through TIRSA) have been able to set artificially high title premiums and secure title profits far

20  in excess of the 5 percent threshold.

21      82.    Through an independent investigation conducted over the past several years, the

22  New York State Attorney General found that for every dollar of insurance premium defendants

23  collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is

24  paid out of claims.  And, of the roughly 85 cents that supposedly covers agency commissions,

25  only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title

26  policy.  These numbers show that title insurers' collectively fixed rates have resulted in profits

27  that vastly exceed the costs of producing such policies.

28      83.    The New York Attorney General's investigation further revealed that what were

-17-

COMPLAINT

1    largely driving these numbers were the kickbacks and other financial inducements defendants

2    were funneling to and through title agents to secure more business. As reported at the New York

3    Insurance Department's 2006 hearing, one title agency's financial statements revealed that it

4    spent more than $1 million of these so-called "agency commissions" on items identified at

5    "Christmas", "automobile expenses", "political contributions", "promotional expenses", and

6    "travel and entertainment". These expenses are not even remotely related to the issuance of title

7    insurance.

8         84.    The Washington State Insurance Commissioner's October 2006 report found

9    strikingly similarly abuses in Washington. Violations were pervasive and the Commissioner

10   concluded that consumers were paying too much as a result.

11        85.    All of this "excess money" paid to title agents not only works to steer business to

12   defendants. It also served to boost defendants' own profits through the inflated revenues they

13   obtain to cover these agency payments and through their ownership or management stake in

14   many of these agencies.

15        86.    Defendants are competitors in the sale of title insurance to consumers throughout

16   the United States. These title insurers have agreed and engaged in concerted efforts to (i)

17   collectively set and charge uniform and supra competitive rates for title insurance, (ii) include in

18   their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,

19   and other charges that are unrelated to the issuance of title insurance, and (iv) hide these

20   supposed "costs" from regulatory scrutiny by funneling them to and through title agents over

21   which the government agencies have no ability or authority to regulate.

22        87.    The GAO in its 2007 report entitled "actions Needed to Improve Oversight of the

23   Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

24   competitions and questions about the reasonableness of prices including:

25        • Consumers find it difficult to shop for title insurance, therefore, they put little

26          pressure on insurers and agents to compete based on price;

27        • Title agents do not market to consumers, who pay for title insurance, but to those

28          in the position to refer consumers to particular title agents, thus creating potential

-18-

COMPLAINT

1    conflicts of interest;

2    • A number of recent investigations by HUD and state regulatory officials have

3    identified instances of alleged illegal activities with the title industry that appear to

4    reduce price competition and could indicate excessive prices;

5    • As property values or loan amounts increase, prices paid for title insurance by

6    consumers appear to increase faster than insurers' and agents' costs; and

7    • In states where agents' search and examination services are not included in the

8    premium paid by consumers, it is not clear that additional amounts paid to title

9    agents are fully supported by underlying costs.

10    88.    The GAO visited several states including California, and found a lack of

11    regulatory oversight:

13    In the states we visited, we found that regulators did not assess title
agents' costs to determine whether they were in line with premium rates; had
14    made only limited efforts to oversee title agents (including ABAs involving
insurers and agents); and, until recently, had taken few actions against alleged
15    violations of anti-kickback laws.  In part, this situation has resulted from a lack
of resources and limited coordination among different regulators within states.
16    On the federal level, authority for alleged violations of section 8 of RESPA,
including those involving increasingly complex ABAs, is limited to seeking
17    injunctive relief.  Some state regulators expressed frustration with HUD's level
of responsiveness to their requests for help with enforcement, and some
18    industry officials said that RESPA rules regarding ABAs and referral fees need
to be clarified.  Industry and government stakeholders have proposed several
19    regulatory changes, including RESPA reform, strengthened regulation of
20    agents, a competitor right of action with no monetary penalty, and alternative
title insurance models.  [*Id.* at 41, footnotes omitted.]

21    E.    **Competition Based on Kickbacks and Inducements But Not Rates**

22    89.    Having agreed to fix or stabilize prices in New York and other states where thy

23    overtly meet to promulgate rates, these same defendants then set out to do the same in other

24    states.

25    90.    In other words, as a direct result of these meetings where rates were agreed to,

26    these same defendants agreed, either expressly or tacitly, to no compete on rates in other states as

27    well.  To compete on rates in other states could and would imperil their ability to maintain the

-19-

COMPLAINT

1    agreed rate in states like New York.

2         91.    As is the case in New York, a lack of regulatory authority over rates created an

3    environment in which a conspiracy can and did succeed.  No agency was examining why all the

4    rates were virtually identical, and no agency was examining whether the costs associated with

5    these premiums were reasonable.  This is an environment which is conducive to price fixing,

6         92.    In California, there is a lack of regulatory authority and oversight over title

7    insurance companies.  The rates in California are not set as part of a deliberate state intervention

8    and the state does not and cannot meaningfully renew or approve these rates.  The rates at issue

9    in this case went into effect without review.

10   **F.    Other Indicators of a Lack of Competition and Conditions Conducive to
             Collusive Rate Setting**

11

12        93.    In addition to the uniformity of rates, other facts suggest that it is more plausible

     than not that rates have been set based on an agreement to fix prices.

13

14        94.    In theory, the chain of title should be documented back to its historic grant of

     ownership centuries in the past.  Fear about a possible title defect in the distant past is widely

15

     used as a justification by title agencies when convincing property buyers to purchase an owner

16

     policy in addition to the lender policy, which is mandatory to secure a mortgage.  The title

17

     agency, however, saves much time and money when the search is limited to one or two

18

     transactions.  They rely on the insurance policy to cover the remote chance of missing an earlier

19

     but still-valid claim.  If such a claim is asserted and survives the scrutiny of the title insurance

20

     company's legal department, the expected costs of compensation is likely to be less than the sum

21

     of added overhead costs of routinely tracing back every chain of title to the earliest registered

22

     owner in the distant past.

23        95.    Title insurance industry officials tend to justify the large proportion of the

24   premium retained by the title abstract and settlement agency (from 60 to more than 90 percent)

25   by the alleged high costs of title searching back into the distant past.  If fact, a high proportion of

26   noncommercial properties are searched only through the most recent transaction.  No information

27   is available as to what proportions of claims originate in the distant past.  The industry has never

28
                                                                                              -20-

                                         COMPLAINT

1   published pertinent statistics.  It would have a marketing incentive to publish these statistics if the

2   risk were significant; that is has not published these statistics indicates that the risk probably is

3   only slightly greater than zero.

4        96.    Many U.S. homes are being resold three or four times in twenty-five years.  At

5   each of these occasions, an abstract of title will be prepared on the basis of a more or less than

6   thorough review of the available title records, inheritance records, family records and records of

7   past or current liens against a property.  It is reasonable, therefore, to suspect that the risk of a

8   title defect will decrease every time a property is sold.

9        97.    Title searches have become less labor intensive, especially in large urban counties

10   and cities.  More and more of the information is available online.  The statistical likelihood that a

11   title default would be overlooked is a closely held industry secret, but it appears to be so small

12   that many transactions that occurred during the last twenty-five to thirty-five years.  The evidence

13   is strong that the title insurance industry has achieved a remarkable high level of loss

14   minimization.

15        98.    Thus the costs of production have decreased as has the risk of loss yet none of

16   these factors has resulted in price competition at the consumer level.

17        99.    There is a remarkable absence of rate changes by title insurers over the past five

18   years, despite the declining costs of production, increased number of transactions and increased

19   revenue per transaction.    During a period when costs per unit of production declined

20   significantly, underwritten title companies and title insurers maintained excessive rates.   The

21   prices charged by title insurers and underwritten title companies were not and are not responsive

22   to the changing costs of production or increasing revenue per transaction at a given set of rates.

23   Again, this is indicia of an agreement not to compete based on price.

24        100.   As noted, the title companies engage in illegal rebates and kickbacks where the

25   title insurer or the underwritten title company provides money, free services or other things of

26   value to a real estate agent, a lender or homebuilder in exchange for business referrals.  These

27   illegal rebates and kickbacks - a consequence of reverse competition - show that title insurance

28   rates are supra competitive and that some portion of the overcharge is passed from the

-21-

COMPLAINT

1  underwritten title company or title insurer to the referrer of business.

2      101.   A lack of competition and the ability to control prices in enhanced by the fact that

3  there were few title insurer entrants over the period from 1995 through 2005 and the number of

4  title insurer groups declined as title insurers acquired other title insurers.   There were few

5  underwritten title company entrants over the 2000 to 2005 period and new entrants were

6  controlled business arrangements whose addition to the market did not result in greater price

7  competition.

8      102.   Access to title plants can be a barrier to entry, but the large barrier to entry exits

9  due to the established relationships between the entities that can steer the consumer's title and

10  escrow business and the entities who sell title insurance and escrow services.

11      103.   The title insurance market is highly concentrated - a few title insurers account for

12  the vast majority of title insurance sales - at both the statewide level and at the county level in

13  California. For example, three title insurer groups account for 77.4% of the market at a statewide

14  level.  At the county level, each individual market was highly concentrated.  The GAO found that

15  First American and Fidelity had a market share of 66 percent.  Such a concentration enhances the

16  ability of companies to fix prices.

17      104.   The agreement not to compete based on price is also evidenced by the fact that no

18  company has marketed its services to consumers, the ultimate purchasers of the product.  This is

19  in marked contrast to real insurance, for example, car insurance, where companies compete

20  vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor" or

21  Allstate's "good hands" or the cute (to some) GEICO gecko promising low prices.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### Violation of the Sherman Act

25      105.   Plaintiff incorporates by reference the preceding allegations.

26      106.   Beginning at least as early as February 2004, and continuing thereafter to the

27  present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged

28  in a combination of conspiracy in unreasonable restraint of the aforesaid interstate trade and

-22-

1    commerce in violation of Section 1 of the Sherman Act.

2    107.    The aforesaid combination and conspiracy has consisted of a continuing

3    agreement, understanding and concert of action among the defendants and their co-conspirators,

4    the substantial terms of which have been:

5    (a)    to fix, raise, maintain and stabilize the price of title insurance throughout

6    California;

7    (b)    to fix, raise, maintain and stabilize the terms and conditions of the sale of

8    title insurance throughout California; and

9    (c)    to allocate and divide the market for title insurance in California.

10    108.    In the absence of proper regulatory authority and oversight, defendants' conduct

11    constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to

12    allocated and divides the title insurance market in California and is *per se* violation of section I of

13    the Sherman Act

14    109.    Defendants' price-fixing, market allocation and division activity has been

15    continuous throughout the relevant damages period and has been renewed and reinforced

16    annually through submissions to the OIC of supposed costs and revenue information and its

17    periodic submissions of rate changes.

18    110.    Through their collective price-fixing, market allocation and division and

19    manipulation of the regulatory process, defendants have harmed competition by charging

20    consumers supra competitive prices for title insurance in California, evidenced in part by the fact

21    that the prices are uniformly higher than compared with the cost of providing the insurance.

22    111.    The aforesaid combination and conspiracy has had the following effects among

23    others:

24    (a)    price competition in the sale of title insurance has been suppressed,

25    restrained and eliminated;

26    (b)    prices for title insurance have been raised, fixed, maintained and stabilized

27    at artificially high and non-competitive levels; and

28    (c)    purchasers of title insurance have been deprived of the benefit of free and

-23-

COMPLAINT

1  open competition.

2      112.    During the period of the antitrust violation by defendants and their co-

3  conspirators, plaintiff and each member of the class she represents, has purchased title insurance

4  and, by reason of the antitrust violations herein alleged, paid more for such that it would have

5  paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the class

6  she represents, has been injured and damaged in an amount presently undetermined.

7                              **COUNT II**

8              **Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.***

9      113.    Plaintiff incorporates by reference the preceding allegations.

10     114.    Defendants conduct as set forth above is in violation of the Cartwright Act of

11  California (Cal. Bus. and Prof. Code §§ 16720, *et seq.*)

12     115.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially

13  inflated prices for title insurance and have suffered injury to their business and property.

14                             **COUNT III**

15             **(Cal. Bus. and Prof. Code §§ 17200, *et seq.*)**

16     116.    The preceding paragraphs of this Complaint are realigned and incorporated by

17  reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§

18  17200, *et seq.*, on behalf of herself and the members of the class.

19     117.    Defendants' statements and representations constitute unfair, unlawful and

20  deceptive trade practices in violation of the UCL.

21     118.    All of the wrongful conduct alleged herein occurs and continues to occur in the

22  conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or

23  generalized course of conduct that is repeated in the State of California on hundreds, if not

24  thousands, of occasions daily.

25     119.    Plaintiff has suffered injury in fact and has lost money or property as a result of

26  defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title

27  insurance than she would or should have absent the conduct complained of.

28     120.    Plaintiff requests that this court enter such orders or judgment as may be necessary

-24-

COMPLAINT

1    to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to

2    restore to any person in interest any money which may have been acquired by means of such

3    unfair competition and to disgorge any profits realized by defendants as a result of its unfair,

4    unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ.

5    Code § 3345, and for such other relief as set forth in the Prayer for Relief.

6                                       **COUNT IV**

7                                  **UNJUST ENRICHMENT**

8          121.    Plaintiff incorporates by reference the preceding allegations.

9          122.    This Cause of action is pled in the alternative to all claims and/or causes of action

10   at law.

11         123.    Defendant has received a benefit from plaintiff and the class members in the form

12   of the prices plaintiff and the class members paid for defendants' title insurance.

13         124.    Defendants are aware of their receipt of the above-described benefit.

14         125.    Defendants received the above-described benefit to the detriment of plaintiff and

15   each of the other members of the class.

16         126.    Defendants continue to retain the above-described benefit to the detriment of

17   plaintiff and the class members.

18         127.    As a result of defendants' unjust enrichment, plaintiff and the class members have

19   sustained damages in an amount to be determined at trial and seek full disgorgement and

20   restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the

21   unlawful or wrongful conduct alleged above.

22                                  **PRAYER FOR RELIEF**

23         **WHEREFORE, plaintiff demands:**

24         A.      That the alleged combination and conspiracy among the defendants and their co-

25   conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

26   Section 1 of the Sherman Act;

27         B.      That the court declares the premiums charged are excessive under state law and

28   order damages;

-25-

COMPLAINT

1    C.    That judgment be entered against defendants, jointly and severally, and in favor of

2    plaintiff, and each member of the class it represents, for threefold the damages determined to

3    have been sustained by plaintiff; and each member of the class it represents, together with the

4    cost of suit, including a reasonable attorneys' fee;

5    D.    Each of the defendants, successors, assignees, subsidiaries and transferees, and

6    their respective officers, directors, agents and employees, and all other persons acting or claiming

7    to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from in

8    any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid

9    combination, conspiracy, agreement, understanding or concert of action, adopting or following

10    any practice, plan, program, or design having a similar purpose or effect in restraining

11    competition; and

12    E.    Such other and further relief as may appear necessary and appropriate.

13                                    **JURY TRIAL DEMANDED**

14    Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged

15    herein.

16

17

18

19

20    Date: April 8 , 2008                                Respectfully submitted,

21

22

23    By: _____

24    DONALD AMAMGBO
      REGINALD TERRELL
25    Attorneys for Plaintiffs

26

27

28

-26-

COMPLAINT