**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CALIFORNIA TITLE INSURANCE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS<br>_____/ | No. C 08-01341 JSW<br><br>**ORDER GRANTING MOTIONS TO DISMISS AND GRANTING LEAVE TO AMEND** |

## INTRODUCTION

Now before the Court for consideration are the Joint Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Joint Motion")[1] and the Motion to Dismiss filed by Old Republic International Corporation ("ORI"). Having considered the parties' papers, relevant legal authority, and the record in this case, the Court HEREBY

---

[1] This motion is filed on behalf of the following defendants: The First American Corporation ("First American"), First American Title Insurance Company, United General Title Insurance Company, Fidelity National Financial, Inc. ("Fidelity National"), Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, Chicago Title Insurance Company, Security Union Title Insurance Company, Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation, Transnation Title Insurance Co., Stewart Title Guaranty Company, Stewart Title Insurance Company, Old Republic National Title Insurance Company, and National Title Insurance of New York, Inc. In its separate motion to dismiss, Old Republic International Corporation ("ORI") states that it incorporates by reference the arguments raised in the Defendants' joint motion. (*See* ORI's Mot. at 1 n.1.) Although ORI has moved separately, the Court's analysis herein applies equally to ORI.

**The Court notes that ORI has not complied with Local Rule 3-4(c)(2), which requires all footnotes to be in 12 point font. The Court hereby places all parties on notice that if the parties fail to comply with this requirement in future filings, the Court shall strike their papers from the record.**

GRANTS Defendants' Joint Motion, GRANTS ORI's motion, and grants Plaintiffs leave to file an amended complaint.

**BACKGROUND**

Plaintiff Lynn Barton filed suit against the Defendants on March 11, 2008. After the Judicial Panel on Multidistrict Litigation denied a motion to transfer, this Court related and consolidated a number of cases filed throughout California. On December 3, 2008, Plaintiffs filed the Consolidated Amended Class Action Complaint ("Am. Compl."), on behalf of themselves and a putative class "of all persons who purchased title insurance relating to the purchase or refinance of residential property located in the State of California directly from one or more of the ... defendants or any co-conspirator," between March 10, 2004 and December 31, 2007 (the "Class Period"). (Am. Compl. ¶¶ 1, 69.)

The following facts are taken as true solely for purposes of this motion. With the exception of a property's purchase price, title insurance is one of the most costly items associated with the closing of a real estate transaction. Unlike other forms of insurance, title insurance offers protection from past events that may affect title to property. (*Id.* ¶¶ 2, 3, 85, 91.) Because the goal of a title search is to uncover defects and to exclude coverage for such defects, the risk associated with the policy is reduced with each real estate transaction and title search. (*Id.* ¶¶ 86, 135-137.) Title insurers do not compete with one another on the basis of the policies or the coverage they provide and do not market their insurance directly to the consumers. Rather, they "rely on 'reverse competition' to market and sell their products." (*Id.* ¶ 3.) Thus, Defendants obtain referrals from middlemen who have "Affiliated Business Agreements with one of the [D]efendants or who otherwise take part in the transaction." (*Id.* ¶ 3, 92-96.) In order to obtain these referrals, "[D]efendants pay middlemen ... in the form of direct payments, advertising expenses, junkets, parties and other kickbacks and inducements." (*Id.* ¶¶ 3, 95-96, 138-146.)[2]

---

[2] According to Plaintiffs, the U.S. Department of Housing and Urban Development and the California Commissioner of Insurance investigated Defendants because of these practices, imposed fines in some instances, and found that Defendants' actions violated certain provisions of federal and state law. (*Id.* ¶¶ 9-11, 147-180.)

2

1  The title insurance market in California, and nationally, is dominated by five title insurers and their subsidiaries or affiliates: the Fidelity family of companies, the First American family of companies, the LandAmerica family of companies, the Stewart family of companies, and the Old Republic family of companies. In California, these five title insurer groups account for approximately 96% of title premiums. (*Id.* ¶¶ 4, 63, 80, 98; *see also id.* ¶ 64 (describing relationship between parent corporations and subsidiaries).) Between 1995 and 2007, the number of title insurer groups declined as title insurers acquired other title insurers. (*Id.* ¶¶ 99-100.) Defendants also are able to prevent price competition, because they "own and control the 'title plants' in many California counties that all title insurers rely on to issue policies." (*Id.* ¶¶ 102-103.)

In New York, New Jersey, Ohio and Pennsylvania, these same five groups of Defendants are members of rate-setting organizations, in which they jointly set title insurance premium rates "at supra-competitive levels." (*Id.* ¶¶ 5, 105-125.) Defendants file their rates in these states with the applicable state insurance authority, but "the rates are not subject to any meaningful review or regulation." (*Id.* ¶ 5.) Defendants avoid regulation by manipulating "rates so that they are principally based on costs, in the form of 'agency commissions' that chiefly cover kickbacks and other inducements unrelated to title insurance, that the state insurance authorities have neither the authority nor the ability to assess." (*Id.*; *see also id.* ¶¶ 105-125.) "As a result of the meetings in New York, New Jersey, Pennsylvania, and Ohio, where rates were agreed to and were collectively set, defendants agreed, either expressly or tacitly not to compete on rates in other states as well," including California, so that their ability to maintain the agreed rates would not be imperiled. (*Id.* ¶ 126.)

New technologies and transaction management systems have reduced the cost of producing each title insurance policy, and most title policies are based on a single set of form policies published and maintained by ALTA, the title insurance industry's national trade association. (*Id.* ¶¶ 3, 92, 131-134.) Title companies also are able to increase their premium volume with a modest increase in personnel and attendant costs. Notwithstanding these developments, "California title insurers filed few or no significant title insurance base rate

3

changes from 1998 to 2007." (*Id.* ¶¶ 127-130; *see also* ¶¶ 131-137, 193-200.) As a result of Defendants' actions, Plaintiffs have "paid higher prices for title insurance than they would have paid in a competitive market." (*Id.* ¶¶ 15, 208, 216, 225.)

Based on these allegations, Plaintiffs contend that "[D]efendants engaged in concerted efforts, either by explicit agreements, or implicitly by a pattern or course of conduct, to: (I) collectively set and charge supra competitive rates for title insurance; (ii) not compete with each other to sell and market title insurance based on price; (iii) include agency commission costs in their calculated rates; (iv) embed within these improper commissions payoffs, kickbacks, and other charges that were unrelated to the issuance of title insurance; and (v) hide these improper inducements from regulatory scrutiny by funneling them to and through title agents whom the government agencies have no ability or authority to regulate," in violation of 15 U.S.C. § 1 (the "Sherman Act claim"), California Business and Professions Code §§ 16720 *et seq.* (the "Cartwright Act claim"), and California Business and Professions Code §§ 17200 *et seq.* (the "Unfair Competition claim"). (*Id.* ¶¶ 84, 201-226.)

## ANALYSIS

### A.    Applicable Legal Standard.

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The complaint is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir. 1986). However, even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Pursuant to *Twombly*, a plaintiffs must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the

4

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. __, 2009 WL 1361536 at *12 (May 18, 2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. ... When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See, e.g., Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

**B.    The Sherman Act Claim is Dismissed, With Leave to Amend.**

Pursuant to Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal." 15 U.S.C. § 1. In order to state a claim under Section 1, Plaintiffs must allege: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States...; and (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1047 (9th Cir. 2008) (citing *Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989)).

**1.    Plaintiffs Have Not Stated A Section 1 Claim Under *Twombly*.**

Defendants' primary argument in support of their motions to dismiss is that Plaintiffs fail to allege facts that show the Defendants agreed to fix title insurance rates in California. In *Twombly*, the Supreme Court held that:

> stating [a Section 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. ... It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, *they*

5

*must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.*

*Twombly*, 550 U.S. at 556-57 (emphasis added); *see also Kendall*, 518 F.3d at 1047 ("claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true," will prove the elements of a Section 1 claim).

In *Twombly*, the plaintiffs alleged that, after the passage of the Telecommunications Act of 1996 (the "Act"), incumbent local exchange carriers ("ILECs") agreed not to compete with one another and agreed to prevent competitive local exchange carriers ("CLECs") from entering the market. *Twombly*, 550 U.S. at 550-51. The plaintiffs argued that the agreement could be inferred, in part, from the fact that the ILECs acted against their economic interest by failing to "pursue attractive business opportunities in contiguous markets where they possessed substantial competitive advantages." *Id.* at 551 (internal brackets and quotations omitted). The Supreme Court, however, concluded that the allegations were insufficient to state a claim, because they were based on parallel conduct. Although one possible inference was an alleged conspiracy, an equally plausible inference was that the ILECs' conduct was a "natural, unilateral reaction," that demonstrated an intent to maintain the regional dominance they enjoyed before the Act was passed. *Id.* at 566-67. Thus, the plaintiffs had not "nudged their claims across the line from conceivable to plausible." *Id.* at 570.

Plaintiffs argue that *Twombly*'s plausibility standard does not apply, because the allegations regarding the rate setting organizations amount to a direct agreement to fix prices. (Opp. Br. at 5:9-7:12.) However, apart from a conclusory statement that "[a]s a result of the meetings in New York, New Jersey, Pennsylvania, and Ohio ... [D]efendants agreed, either expressly or tacitly, to not compete on rates in other states as well," there are no factual allegations to support that conclusion. (*See* Am. Compl. ¶¶ 105-126.) Accordingly, the Court evaluates the allegations of the Amended Complaint to determine if there are sufficient facts from which a conspiracy can be inferred.[3] Plaintiffs contend that such an inference is plausible

---

[3] Indeed, in their opposition brief, Plaintiffs acknowledge that one must infer the existence of an agreement to fix prices in California. (Opp. Br. at 8:17.)

6

1 based on allegations that the Defendants had the opportunity to conspire because of their
2 membership in the rate setting organizations, on allegations that the Defendants had a motive to
3 conspire, and on allegations that the title insurance market has several characteristics that
4 facilitate the alleged conspiracy, including market concentration, significant barriers to entry,
5 declining title search costs, homogeneity of the product, and a low risk of claims.

6 Plaintiffs argue that Defendants improperly used the organizations as a means to impose
7 supra-competitive prices. Specifically, Plaintiffs allege that Defendants set rates based on
8 commissions and kickbacks, which state agencies cannot properly evaluate or regulate, rather
9 than on the costs associated with the risk of loss to the title insurer. (Am. Compl. ¶¶ 110-112,
10 115, 120, 125; Opp. Br. at 5:9-7:12.) It is undisputed that the purpose of the rate setting
11 organizations is to set title insurance rates and that the rate setting organizations are authorized
12 by statute. (Am. Compl. ¶¶ 114, 117, 122.) Those facts do distinguish this case from others, in
13 which courts concluded that participation in the same trade organizations is insufficient to
14 establish a conspiracy. *See, e.g., In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 441
15 (S.D.N.Y. 2008); *In re LTL Shipping Servs. Antitrust Litig.*, 2009 WL 323219 (N.D. Ga. Jan.
16 28, 2009); *cf. In re Citric Acid Litig.*, 996 F. Supp. 951, 958-959 (N.D. Cal. 1998) (concluding
17 on summary judgment that no inference of conspiracy could be raised from participation at
18 meetings between defendants), *aff'd*, 191 F.3d 1090, 1103 (9th Cir. 1999).

19 However, it does not follow automatically that, because they may have set rates
20 collectively in those states with rate setting organizations, the Defendants acted collectively to
21 fix prices in California. Participation in the rate setting organizations may have provided
22 Defendants the opportunity to discuss setting rates in California, but opportunity, without more,
23 is not a plausible basis to suggest a conspiracy. *See, e.g., In re Late Fee and Over Limit Fee*
24 *Litigation*, 528 F. Supp. 2d 953, 963-64 (N.D. Cal. 2007) (citing *Twombly*, 550 U.S. 567 n.12)
25 (hereinafter "*In re Late Fee*"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d
26 1011, 1023 (N.D. Cal. 2007) ("*In re Graphics Processing I*"); *Classic Homes and Development,*
27 *LLC v. Fidelity National Title Ins. Co.*, 4:08-CV-217-GTE, Order Granting Motion to Dismiss
28 slip. op. at 7-8 (E.D. Ark. May 14, 2009) (noting plaintiffs' allegations that defendants shared

7

1  common membership in rate setting organizations but concluding that allegations were "nothing
2  more than a set of facts establishing an opportunity to conspire, high prices and market
3  concentration").[4]

4  In addition, Plaintiffs do not set forth factual allegations about whether the rate setting
5  organizations merely gave the Defendants the opportunity to obtain information about each
6  other's rates or whether the rate setting organizations held formal meetings. If such meetings
7  occurred, Plaintiffs do not set forth facts about where or when those meetings took place, or
8  whether the Defendants communicated with one another in advance of or after the meetings.
9  Under *Twombly*, such vague allegations are insufficient. *Compare Kendall*, 518 F.3d at 1047
10 ("complaint must allege facts such as a 'specific time, place or person involved in the alleged
11 conspiracies'") (quoting *Twombly*, 550 U.S. at 564 n.10); *In re Late Fee*, 528 F. Supp. 2d at 962
12 (granting motion to dismiss where complaint provided "no details as to when, where, or by
13 whom this alleged agreement was reached") *with In re TFT-LCD (Flat Panel) Antitrust Litig.*,
14 586 F. Supp. 2d 1109, 1115-16 (N.D. Cal. 2008) (finding allegations sufficient to state a claim
15 where complaint included statements by specific defendants) (hereinafter "*In re TFT-LCD I*");
16 *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 901 (N.D.
17 Cal. 2008) (denying motion to dismiss where allegations included particular communications
18 between defendants).

19 Plaintiffs also do not allege facts setting forth, at a basic level, which Defendants may
20 have attended meetings of the rate setting organizations, the types of employees that may have
21 attended such meetings, or whether those employees reported back to their parent organizations.
22 *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D.
23 Cal. 2009) (denying motion to dismiss where plaintiffs did not set forth names of employees but
24 did allege the types of employees who attended meetings) (hereinafter "*In re TFT-LCD II*").
25 Plaintiffs also have not alleged facts setting forth a temporal link between the release of rates in
26 rate-setting organizations in other states and the release of rates in California. *See, e.g., In re*

---

[4] See Docket No. 123, Defendants' Statement of Recent Decision, Ex. A.

8

*TFT-LCD I*, 586 F. Supp. 2d at 1116 (concluding that allegations were sufficient where plaintiffs alleged facts showing invitation to agreement and subsequent agreement).

Plaintiffs contend that Defendants' motive creates a plausible inference of a conspiracy. Specifically, Plaintiffs allege that "price competition in [California] would reveal the true costs of title insurance and the supra-competitive profits to state regulators in the four overt rate setting states." (Opp. Br. at 7:14-17.)[5] However, Plaintiffs also allege that approximately 85% of the total title insurance premiums are based on the alleged kickbacks and commissions. The allegations also suggest the state regulatory agencies are aware of these costs but lack the authority to review the commissions. (*See, e.g.,* Am. Compl. ¶¶ 110-112.) Thus, Plaintiffs' own allegations undermine the alleged motive to fix prices in order to hide these practices. Defendants also have not admitted that they acted improperly in setting rates in the states with rate setting organizations. Thus, this is not a situation where the Defendants have admitted to conspiring in one market, which might allow the Court to infer a conspiracy in another market. *See, e.g., In re SRAM*, 580 F. Supp. 2d at 903 (noting that allegations that the same actors were involved in a conspiracy in DRAM market and had entered guilty pleas in connection with that conspiracy, with other allegations, supported inference of conspiracy in SRAM market). Plaintiffs also allege that if Defendants were "[t]o compete on rates in other states, including California, [that competition] could and would imperil defendants' ability to maintain the agreed rates they set, and the supra-competitive profits, they enjoyed" in the four rate setting states. (*Id.* ¶ 126.) An equally plausible inference is that the Defendants engaged in conscious parallelism, which is not in itself unlawful. *See, e.g., Twombly*, 550 U.S. at 566; *In re Graphics Processing I*, 527 F. Supp. 2d at 1023 n.6.

Plaintiffs also rely on their allegations that the title insurance market is highly concentrated to support an inference of collusion. However, "parallel behavior in a

---

[5] Plaintiffs allege that title insurance premium rates in California range from above $1500 to just above $1700, and that those rates have held steady since approximately 1998. (Am. Compl. ¶ 196.) Plaintiffs have not, however, set forth any facts to compare rates in California with rates in other states, including states with rate setting organizations. It appears, however, that title insurance rates across the country are far from uniform. *See, e.g., Classic Homes*, slip. op. at 7 (noting average price for Arkansas premium is $1,150).

9

concentrated market is insufficient to suggest a conspiracy because it is a 'common reaction of firms in a concentrated market' to 'recogniz[e] their shared economic interests' and to reach similar 'price and output decisions' independently." *In re Late Fee*, 528 F. Supp. 2d 964 (quoting *Twombly*, 550 U.S. at 553-54) (brackets as in *Twombly*). Plaintiffs allege that Defendants' prices have remained stable although costs have declined and although title insurance policies are homogeneous. To the extent Defendants' costs are similar, that fact "would explain why the [D]efendants' prices would naturally be similar without the need for any agreement." *In re Late Fee*, 528 F. Supp. 2d at 964. Similarly, "competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price fixing." *In re Graphics Processing I*, 527 F. Supp. 2d at 1022 (noting that allegations of parallel pricing "could possibly be indicative of a conspiracy" but dismissing because the allegations fell "short of *unusual, lockstep pricing behavior*") (emphasis added).

In *Twombly*, the Supreme Court stated that in some instances parallel conduct might be indicative of a conspiracy. For example, "'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason'" might "support a plausible inference of conspiracy." *Twombly*, 550 U.S. at 556 n.4. Plaintiffs allege that the conspiracy began "at a time presently unknown to Plaintiffs, but at least as early as March 2004[.]" (Am. Compl. ¶ 211.) Plaintiffs, however, do not forth facts regarding the Defendants' pricing behavior prior to the alleged conspiracy, although Plaintiffs allege that pricing in California has remained stable since at least 1998. Thus, there are no allegations suggesting an "unprecedented change" in the Defendants' behavior. The lack of such allegations also distinguishes this case from others in which courts have concluded that plaintiffs put forth enough facts to nudge their claims across the line from conceivable to plausible. *See, e.g., In re TFT-LCD I*, 586 F. Supp. 2d at 1115-16; *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1091-95 (N.D. Cal. 2007).

For all of these reasons, and looking at the allegations as a whole, the Court concludes that the allegations regarding the rate setting organizations taken together with the "plus

10

1  factors" identified by Plaintiffs do not "nudge their claims across the line from conceivable to

2  plausible." *Twombly*, 550 U.S. at 570.[6]

### 2. Plaintiffs have not alleged sufficient facts to state a claim against the Parent Corporations.

Fidelity National, First American, and ORI (hereinafter "the Parent Corporations") also move to dismiss on the basis that Plaintiffs have not alleged facts showing that they were parties to the alleged price fixing agreement. "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). It also is well established that a plaintiff cannot premise a Section 1 claim based on an alleged conspiracy between a parent corporation and its subsidiary, because an agreement under the Sherman Act must be between separate, independent entities capable of combining their efforts to restrain trade. *See, e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-771 (1984). Thus, to state a claim against the Parent Corporations, Plaintiffs either must set forth facts establishing direct participation in the alleged conspiracy or set forth sufficient allegations showing that the Parent Corporations are vicariously liable for the acts of their subsidiary corporations.[7] The Court concludes that Plaintiffs have failed on both counts.

First, there are no factual allegations in the Amended Complaint as to how or when each of the Parent Corporations joined the alleged conspiracy. A "complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD I,* 586 F. Supp. 2d at 1117 (internal quotations and citations omitted). In that case,

---

[6] The Cartwright Act claim is based on the same allegations as the Sherman Act claim. "[A]nalysis under California's antitrust law mirrors the analysis under federal law[.]" *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *see also In re Late Fee*, 528 F. Supp. 2d at 965. For the reasons set forth herein, the Cartwright Act claim also is dismissed, with leave to amend.

[7] Plaintiffs do not allege and do not argue that the Parent Corporations are liable under an alter-ego theory. (*See generally* Am. Compl. ¶¶ 29-45, 59-62, 65-68; Opp. Br. at 18:7-19:20, 24:23-25:15.)

11

1 the court dismissed claims against certain defendants, because "general allegations as to all defendants, to 'Japanese defendant,' or to a single corporate entity such as 'Hitachi,'" were insufficient to put specific defendants on notice of the claims asserted against them. *Id.* Plaintiffs here also make general allegations against the "Defendants," without distinguishing among them.

Plaintiffs argue that they need not allege overt acts committed by each defendant in furtherance of the alleged conspiracy and rely on *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 164 n. 27 (D.D.C. 2004) to support this argument. However, *Jung* does not stand for the proposition that plaintiffs are relieved of their obligation to allege that each defendant agreed to join or participated in the alleged conspiracy. *See Jung*, 300 F. Supp. 2d at 164 n. 27 ("Plaintiffs' reference to ... *In re Vitamins Antitrust Litigation*, 2000 WL 1475705, is misplaced. In that case, Chief Judge Hogan concluded that a plaintiff need not allege overt acts committed by each defendant in furtherance of a conspiracy. ... *He did not hold that plaintiffs need not plead that an individual defendant was a participant in the conspiracy in the first instance.*") (emphasis added); *see also id.* at 161, 163. Here, as in *In re TFT-LCD I* and *Jung*, Plaintiffs attempt to show the Parent Corporations directly participated in the conspiracy by making general allegations as to the families of the title insurance companies, without any specific allegations as to what the Parent Corporations did. Those allegations are insufficient to put the Parent Corporations on notice of the claims asserted against them.

Plaintiffs also allege that the each of the Parent Corporations "wholly owns and controls its affiliates and subsidiaries," that each does business in California "through" those subsidiaries, and that each of the subsidiaries "engaged in the conduct challenged here with the approval" of the Parent Corporations. (Am. Compl. ¶¶ 29, 36, 40, 43, 60.) Plaintiffs further allege that "[e]ach defendant acted as the principal, agent or joint venturer of, or for, other defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs." (*Id.* ¶ 67.) Unlike the plaintiffs in the *In re TFT-LCD II* case, the Plaintiffs here do not attempt to allege any facts to show that the parent corporations knew what their subsidiaries were doing. *See, e.g., In re TFT-LCD II* 599 F. Supp. 2d at 1184. Thus, to the extent Plaintiffs

12

United States District Court
For the Northern District of California

rely on an agency theory to assert claims against the Parent Corporations, the Court concludes that the allegations of agency are more than bare legal conclusions, which the Court need not accept as true. *Twombly*, 550 U.S. at 555. Accordingly, in the amended complaint permitted by this Order, Plaintiffs must set forth additional facts regarding the Parent Corporations' participation in or approval of the alleged conspiracy.

**B.     The Unfair Competition Claim is Dismissed, With Leave to Amend.**

Pursuant Section 17200, "there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent." *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 837 (2006); *see also Albillo v. Intermodal Container Services, Inc.*, 114 Cal. App. 4th 190, 206 (2003) (to state a UCL claim, a "plaintiff must establish that the practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)"). Plaintiffs' Section 17200 claim is based, in part, on the alleged price fixing conspiracy. (Am. Compl. ¶¶ 222.a, 222.b.) For the reasons set forth above, Plaintiffs have failed to state a Section 17200 claim based on those facts. *See In re Late Fee*, 528 F. Supp. 2d at 965; *Apple Inc. v. Pystar Corp.*, 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008) (citing *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)).

Plaintiffs also premise the Unfair Competition claim on the allegedly illegal rebates, kickbacks and commissions, and they allege this conduct allowed the Defendants to charge them more for title insurance than they would charge absent the costs involved with the kickbacks. (Am. Compl. ¶ 222.c.) Defendants argue that Plaintiffs have failed to allege facts demonstrating the alleged kickbacks caused them harm. The Court disagrees and finds Defendants' reliance on *Mahoney v. Fidelity National Title Co.*, 2008 WL 4286934 (C.D. Cal. Sept. 15, 2008), to be misplaced. In the *Mahoney* case, the plaintiff did not allege that he paid more for insurance because of the referral fee at issue. *Id.*, 2008 WL 4286934 at *3. Here, Plaintiffs contend that the Defendants improperly included the costs of kickbacks into the title insurance premium rates, thereby inflating those rates. Plaintiffs further allege that but for the

improper kickbacks they would have paid less for title insurance. Accordingly, Plaintiffs have set forth facts sufficient to state an Unfair Competition claim on this basis.

However, Defendants also assert that Plaintiffs lack standing to bring the Unfair Competition claim against Defendants from whom they did not purchase title insurance. Plaintiffs have not identified with specificity which defendant or defendants from whom they purchased title insurance. Accordingly, the Section 17200 claim must be dismissed on this basis as well. Plaintiffs are granted leave to amend, and each Plaintiff must identify the Defendant or Defendants from whom they purchased insurance when they amend their complaint. Defendants are free to renew the standing argument in any subsequent motion to dismiss.[8]

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss are GRANTED. Plaintiffs shall file the amended complaint permitted by this Order by no later than June 19, 2009.

**IT IS SO ORDERED.**

Dated: May 21, 2009

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

---

[8] In light of the Court's determination that Plaintiffs have not alleged facts sufficient to state a claim under the UCL, the Court does not reach Defendants' alternative argument that the UCL claim is barred by the Insurance Code. If Defendants choose to renew this argument in connection with a subsequent motion to dismiss or a motion for judgment on the pleadings, the Court requests that the parties devote greater attention to this issue than they did in the motions to dismiss.

14